[File No. Cr. 186.]

STATE OF NORTH DAKOTA, Respondent, v. W. F. McCLEL-LAND, Appellant.

(10 NW(2d) 798.)

Opinion filed March 1, 1943. On Rehearing August 24, 1943.

*Scotl Cameron* and *John F. Sullivan,* for appellant.

*Alvin C. Strulz,* Attorney General, and *Wm. R. Pearce,* Assistant Attorney General, for respondent.

Morris, Ch. J. This is an appeal from a judgment and sentence entered pursuant to the verdict of a jury finding the defendant guilty of rape in the first degree. The verdict was returned February 27, 1942. Upon petition of the defendant the trial court deferred passing of sentence until March 24, 1942. On that date the court pronounced judgment against the defendant and passed sentence upon him. Written judgment was signed by the court and filed with the clerk on that day. At the request of counsel for defendant the court ordered the time with-

in which a motion for a new trial might be made extended for a period of sixty days.

On May 23, 1942, the court made an order, pursuant to the application of counsel for the defendant and with the consent of counsel for the state, extending the time for making a motion for a new trial and for filing notice of newly discovered evidence and serving affidavits pertaining thereto to the 8th day of June, 1942.

On May 27, 1942, the court upon application of defendant's counsel and after a telephone conference with the Attorney General who had charge of the prosecution, made another order extending the time for making a motion for a new trial to the 15th day of July, 1942.

Certain affidavits in connection with an application for a new trial on the ground of newly discovered evidence were filed with the clerk of the district court on July 6, 1942. The motion for a new trial based upon these affidavits was noticed for hearing on July 14, 1942. The affidavits were sworn to at various times from March 19 to May 23rd, 1942.

On July 6, 1942, the defendant filed in the office of the clerk of the district court a notice of motion for a new trial, motion, specifications of error and affidavits in support of the motion. On July 9, 1942, these instruments were served on counsel for the state. The notice fixed the time for hearing of the motion for July 14, 1942 at 10 o'clock A. M. at the courthouse in Mandan. At that time the defendant appeared in person and by counsel and the state was represented by the attorney general and his assistant.

Counsel for the state objected to the motion for new trial on the ground that the court had no jurisdiction to consider the same because the motion was made too late for various reasons that were set out at length in written objections. The court denied the motion on the following grounds:

"1. That the said motion was made too late and after the statutory time for making such motion had expired and elapsed.

"2. That on the merits no sufficient grounds have been shown by the defendant to grant a new trial of this case."

Defendant's notice of appeal from the order denying the motion for a new trial was served on counsel for the state on October 7, 1942 and

filed in the office of the clerk of court on the same day. It was filed in the supreme court on October 10, 1942. A notice of appeal from the judgment and sentence was served on counsel for the state on March 24, 1942, and filed in the supreme court, June 17, 1942.

The motion for new trial was made upon various grounds consisting of insufficiency of the evidence, newly discovered evidence and errors of law occurring at the trial which are pointed out in specifications covering the admission of testimony and failure to give a requested instruction. Affidavits and counteraffidavits in connection with the newly discovered evidence are presented in the record.

The state contends upon this appeal as it did before the trial court that the motion for a new trial came too late and that the trial court was wholly without jurisdiction to consider it.

Section 10,917, N. D. Comp. Laws 1913, states: "When a verdict has been rendered against the defendant, the court in which the trial was had may, upon his application, grant a new trial in the following cases only:"

The first four paragraphs have no application in this case.

"5. When the court has misdirected the jury in a matter of law, or has erred in the decision of any question of law arising during the course of the trial, or has done or allowed any act in the action prejudicial to the substantial rights of the defendant.

"6. When the verdict is contrary to law or clearly against the evidence.

"7. When new evidence is discovered material to the defense, and which the defendant could not, with reasonable diligence, have discovered and produced at the trial."

Section 10,920, N. D. Comp. Laws 1913, provides: "The application for a new trial, except in case of a sentence of death, must be made before the time for an appeal has elapsed."

In a criminal action, an appeal may be taken from a judgment within three months after its rendition and from an order within sixty days after it is made. Chapter 217, N. D. Session Laws 1927. The judgment in this case was entered March 24, 1942. The time for appeal extended for three months from that date. The time for making an application for a new trial was limited to a period of three months from

that date. An appeal from the judgment was taken by serving and filing a notice of appeal within proper time. The motion for a new trial was not brought on for hearing until in July. This court has passed on the question under consideration in several cases. In State v. Hagen, 54 ND 136, 208 NW 947, it is held that a motion for a new trial and an appeal from a judgment are separate remedies and that the taking of an appeal does not extend the time within which a motion for new trial must be made. This rule was followed in State v. Gibson, 69 ND 70, 284 NW 209. Thus, it is clear that the appeal from the judgment did not extend the time for making a motion for a new trial beyond three months from the rendition of the judgment.

Section 10,920 is mandatory in its language to the effect that an application for a new trial must be made before the time for an appeal has elapsed. The right to a new trial can only be conferred by statute. It can be had only upon grounds which the law grants and upon application made within the time specified. When that time expires the court is without authority to entertain or grant such a motion. State v. Hagen, and State v. Gibson, supra; State v. Krueger, 57 ND 636, 223 NW 583. In the later case the defendant who was convicted of the crime of rape moved for a new trial on the ground of newly discovered evidence. The motion was made after the time for appeal had expired. The trial court held that it had no jurisdiction to hear and grant the motion. This court affirmed that decision.

The trial court had no jurisdiction to entertain or grant the defendant's motion. The situation is therefore the same as if no motion for a new trial had been made. The supreme court of Missouri had before it a similar situation in State v. Brown, 339 Mo 1014, 98 SW(2d) 777, wherein it is said: "The Missouri decisions, above referred to, are unanimous in holding that a motion for new trial, filed after the statutory period for its filing had expired, is to be treated as a nullity. If so, the situation is the same as if no motion had been filed. The conclusion then is inescapable that the state cannot by stipulation have this court consider a motion for new trial to have been filed, when in fact none was filed. If the state could so stipulate and have this court review the rulings of the trial court, then the matter of filing motions for new trial would no longer be controlled by our statute. The statute could then be set aside by mutual consent to suit the convenience of the par-

ties. We must not lose sight of the fact that we are all governed by the same law. That law is just as binding upon this court as it is upon the appellant in this case."

In Webster v. State, 209 Ind 274, 198 NE 781, the trial court overruled defendant's motion for a new trial that was made after the time prescribed by statute had expired. On appeal it was urged that the supreme court should nevertheless consider the case on its merits. In discussing this contention it was said: "The attorneys for the appellant strenuously and ably insist that this court should disregard the time limit as prescribed by the statute in filing a motion for a new trial and consider the appeal on its merits. At common law there was no right to file a motion for a new trial, and, as it is a right conferred by statute, one who would avail himself of the right must bring himself within it. As said in the case of Ward v. State (1909) 171 Ind 565, 86 NE 994, 995: 'In most, if not all, enlightened states, a desire to secure the fullest attainable justice has prompted provisions for a new trial when substantial and prejudicial error in the former trial has been seasonably shown by the defendant. The interests of the accused and the welfare of the state demand promptness in the hearing and final disposition of criminal charges. Such cases must at some time be effectually and finally terminated in the courts, and thereafter remain at rest.' "

This court has no appellate jurisdiction other than that prescribed by statute. Section 109 of the North Dakota Constitution provides that: "Writs of error and appeals may be allowed from the decisions of the district courts to the supreme court under such regulations as may be prescribed by law."

Thus it will be seen that no right of appeal from the district courts is conferred by the Constitution. That right is left to statutory provisions and must be exercised in accordance therewith. An appeal, therefore, embraces only that which is contemplated by the law enacted by the legislature and must be taken within the time that the legislature has seen fit to provide. Stimson v. Stimson, 30 ND 78, 152 NW 132; State v. Hueremann, 37 SD 649, 159 NW 398.

The defendant's appeal from the judgment was perfected in time and includes certain specifications of error upon which reversal of the judg-

ment is urged. An appeal from a judgment only brings to this court for review errors of law committed by the trial court and appearing in the record of the action which have been preserved and presented in the manner prescribed by statute.

Sufficiency of the evidence to sustain the verdict, not challenged either by motion for a new trial or for an advised verdict, cannot be considered on an appeal from the judgment alone. State v. Glass, 29 ND 620, 151 NW 229; State v. Fahn, 53 ND 203, 205 NW 67; State v. Johnson, 68 ND 236, 278 NW 241; State v. Mostad, 70 ND 73, 291 NW 910. In this case the sufficiency of the evidence not having been challenged in the court below is not properly before us on appeal.

The defendant does not claim that any of the instructions given by the trial court were erroneous. He does specify, however, that the court erred in failing to give an instruction that he requested to be given to the jury. No exceptions to the trial court's instructions were taken in the court below as required by statute. In order to secure a review of instructions to the jury either on appeal or on motion for a new trial exceptions must be taken in the manner prescribed by §§ 10,824 and 10,825, N. D. Comp. Laws 1913. This question was considered at length in State v. Shoars, 59 ND 67, 228 NW 413, wherein it is said that: "It is clear from these sections that it is the intent of the law that all objections to the instructions to the jury by the trial court in a criminal case must be preserved by exceptions or they are waived. If the instructions are written and the trial judge submits them to counsel with a reasonable time for examination, and counsel does not except to the instructions or any part thereof, all objections are waived. If the trial judge does not submit the instructions to the counsel, exceptions may be filed any time within twenty days from the filing of the instructions in the office of the clerk of the district court."

The rule in the Shoars Case has since been followed in State v. Balliet, 61 ND 703, 240 NW 604; State v. Bossart, 61 ND 708, 240 NW 606; and State v. Youman, 66 ND 204, 263 NW 477. The statutes and the authorities were again thoroughly examined and reviewed in State v. Gibson, 69 ND 70, 284 NW 209, wherein we said: "The Shoars Case, 59 ND 67, 228 NW 413, was decided in January, 1930. Four legislative assemblies have since convened and there has been no attempt to

change the rule that was announced in that decision. That rule is in harmony with the rule prevailing in practically all other jurisdictions. To attempt to depart from or change it by judicial interpretation would be, in effect, to enter into the field of legislation."

The appeal from the judgment brings before us questions of the admission or rejection of evidence raised at the trial and specified as error on appeal. The defendant so specifies the overruling of objections to the admission of certain testimony of the witness, Anna Fluvog, against whom the defendant is alleged to have committed the crime charged in the information. Defendant's counsel cross-examined her with regard to a charge of rape previously brought against one Don Millard. She testified that he was arrested upon a complaint made by her father and bound over to district court. Then followed the ensuing cross-examination:

"Q. Did you have any physical examination after that?

"A. Yes, I did.

"Q. By a doctor?

"A. Yes, sir.

"Q. And the doctor told that you never had intercourse with anybody up to that time?

"A. Yes, he did.

"Q. And testified and certified to the court that you never had intercourse with anybody up to that time. Is that not true?

"A. Yes."

On redirect examination she was permitted to explain her testimony upon cross-examination as follows:

"A. Well, I thought he asked me if I had sexual intercourse and the doctor said I never did have before I had that sexual intercourse with Don Millard."

Defendant's counsel contends that by the cross-examination above quoted the witness testified that the doctor who examined her certified that she had never had intercourse with anyone up to the time of the examination by the doctor which would tend to establish that her claim of being raped by Don Millard was false. Thus, her credibility would be impeached. It is asserted that her testimony on redirect examination is not the explanation of a confused witness but a complete change in her story. The state, on the other hand, contends

that the cross-examination is ambiguous and that the witness was entitled to explain it.

A careful reading of this testimony discloses that the witness could readily have been confused by the language used in the questions of defendant's counsel. He twice used the phrase "up to that time" which from the context of the examination could mean either the time of the alleged rape or the time of the examination by the doctor. It was entirely proper for the court to permit her to explain which she understood the questions to mean. We find no error in the court's ruling with respect thereto.

The trial court correctly determined that he had no jurisdiction to entertain the motion for new trial. He also considered the merits of the grounds urged and set forth in a comprehensive memorandum opinion his reasons for reaching the conclusion that the grounds for the motion were without merit. We have not confined our examination of the record to procedural matters and the application of statutes with reference thereto. We have explored the record thoroughly. The defendant has had a fair trial. The jury was not misinstructed. We have read the affidavits and the counteraffidavits submitted in connection with the motion for new trial on the ground of newly discovered evidence. The record does not indicate that as a matter of justice and aside from the law as to proper practice that the case should be tried over again.

We have also examined the judgment roll and the record in so far as it is properly before us on this appeal. We have discovered no error therein and none has been pointed out to us. The judgment appealed from must be and is affirmed.

Burr, Nuessle, Burke, and Christianson, JJ., concur.

Morris, Ch. J. (on rehearing). Upon petition of the appellant a rehearing was granted on the appeal from the judgment. It is contended that in the decision heretofore written, consideration was not given to all of the contentions made by the appellant with reference to errors which he claims arose from the re-examination of the witness, Anna Fluvog, by counsel for the state. The appellant challenges no principles of law enunciated in the main opinion. He argues strenuous-

ly that these principles do not cover the error which he asserts resulted from a portion of the redirect examination of the witness in question. We did not discuss in detail that portion of the testimony of which he specifically complains and are, therefore, constrained to re-examine the record in this respect and amplify our decision with reference thereto.

Upon direct examination by counsel for the state, the complaining witness testified that the defendant took her and two other girls to a basketball game in Bismarck on the evening of March 8, 1940. At that time the defendant was superintendent of the State Training School of which all three girls were inmates. Upon returning to the Training School grounds the defendant took the three girls to his office and gave them cigarettes and a box of candy. After a few minutes he excused two of the girls and asked the complaining witness to stay which she did. He then had sexual intercourse with her twice before permitting her to leave the office. After he had excused the other two girls, the complaining witnesses asked the defendant why he called her back. The defendant said he wanted to talk to her about Don Millard. The witness then explained that Don Millard had been charged with committing rape on her in 1939 before she had been committed to the Training School. That charge, however, had nothing to do with her commitment.

When defendant's counsel cross-examined the complaining witness he inquired about the Don Millard case. After bringing out that Millard was bound over to the district court the following inquiries were made:

"Q. Did you have any physical examination after that?

"A. Yes, I did.

"Q. By a doctor?

"A. Yes, sir.

"Q. And the doctor told that you never had intercourse with anybody up to that time?

"A. Yes, he did.

"Q. And testified and certified to the court that you never had intercourse with anybody up to that time. Is that not true?

"A. Yes."

Upon redirect examination it was brought out that the witness was confused and did not understand the import of the questions on cross

examination which we have quoted above. The witness said: "A. Well, I thought he asked me if I had sexual intercourse and the doctor said I never did have before I had that sexual intercourse with Don Millard." She testified that the examination took place in the office of Doctor Schatz in West Fargo in the presence of her mother and father. She was then asked: "Q. And did you hear the doctor make some statement as to your physical condition to your father and mother?" to which she replied "yes." An objection to her statement as to what the doctor said was sustained by the court at that time. He gave counsel an opportunity to investigate authorities. Other testimony was then taken of the same witness and of another witness. Later, the complaining witness was called to the stand for further redirect examination and counsel for the state asked her for the doctor's statement. Defendant's counsel objected on various grounds among them being that the testimony sought to be elicited was "directed to a time and an examination entirely different and distinct from the examination concerning which I inquired from the witness." Further objection was made on the ground that the testimony was hearsay, incompetent, irrelevant, immaterial and self-serving. After further colloquy between the court and counsel for both sides defendant's objection was overruled and the examination proceeded as follows:

"A. The doctor said that I was so ripped and torn that if my father did not report it, he would do it.

"Q. What else did he say?

"Mr. Sullivan: The same objection.

"A. He said—he made the statement that he would report it if my dad did not, and that my condition was terrible.

"Q. Now Mr. Sullivan asked you and you replied when he asked you this question: 'And the doctor told that you never had intercourse with anybody up to that time.' And you answered: 'Yes, he did.' What was the statement the doctor made in connection with that?

"A. He said I had never had intercourse up to the time Don Millard did it.

"Mr. Sullivan: Same objection to that statement, to that question as to the two previous questions."

The defendant contends that the overruling of his objection to the testimony above quoted is prejudicial error. It is urged that the state-

ments as to what the doctor said about the condition of the complaining witness are hearsay and not a part of any conversation inquired about or referred to on cross-examination. Defendant further contends that even if this testimony be construed to refer to the physical examination inquired of in defendant's cross-examination that it refers to a different subject. It is asserted in defendant's brief on rehearing: "that the question on cross-examination put to the witness referred only to the subject of the time of her first sexual experience, on redirect examination, and after explanation of the misunderstanding had been made, to then introduce to the jury, with no foundation other than the cross-examination (on) a different subject, namely her torn and bleeding condition at the time of the examination, the opinion of the doctor as to what should be done about it, the doctor's admonition and instruction to the father of the witness, and the doctor's threat of personally acting himself if his suggestion was not carried out, all in connection with the fact that that action had been dismissed, constituted reversible error."

The testimony that is the basis of the alleged errors now under consideration has been emphasized to an extent that is out of all proportion to its importance in the case. The only connection that the Millard incident has with the defendant is that the defendant used it as an excuse for calling the complaining witness back after dismissing her companions. There is no intimation that the defendant ever knew or had any connection with Millard. The evident purpose of the cross-examination of the complaining witness regarding the Millard incident was to impeach her veracity and discredit her before the jury by creating the impression that she had brought an accusation of rape against Millard and that after she had been examined by a doctor, the doctor said she had never had intercourse with anyone up to the time of the examination. She understood the words "up to that time" used by examining counsel to have reference to the time of the rape and not the time of the physical examination. The examination being physical it follows that what the doctor said was based on her physical condition as disclosed by his examination.

Counsel for defendant insists that this cross-examination refers only "to the subject of the time of her first sexual experience." However, counsel sought information on that subject by asking what the doctor

"told" after making an examination of her physical condition. Thus, her condition became pertinent to the subject of the inquiry and what the doctor said about it became a relevant part of his statement under the rule of completeness.

It is strenuously urged that the doctor's statement as repeated by the witness over the defendant's objection is hearsay and irrelevant to any issue in the case. If offered on examination in chief it would clearly have been objectionable on both grounds. The evidence in question was brought out on redirect examination after defendant's counsel by cross-examination had himself brought out evidence that was clearly hearsay. The purpose as we have already pointed out was impeachment of the witness. He was temporarily successful. She was placed in a position of being subject to discredit before the jury. She clearly had the right to explain her testimony and rehabilitate her credibility. The extent to which a witness may be permitted to explain under such circumstances is primarily within the discretion of the trial court. Erickson v. Wiper, 33 ND 193, 157 NW 592; 31 CJS p. 914. It is only when the trial court abuses sound judicial discretion in the admission of such explanatory evidence that error results.

The situation before us is similar to that where a witness is impeached by seemingly contradictory statements. Professor Wigmore, in the third edition of his work on Evidence, treats explanations of such inconsistencies in the following sections:

§ 1044. "In accordance with the logical principle of Relevancy (ante, § 34), the impeached witness may always endeavor to explain away the effect of the supposed inconsistency by relating whatever circumstances would naturally remove it. The contradictory statement indicates on its face that the witness has been of two minds on the subject, and therefore that there has been some defect of intelligence, honesty, or impartiality on his part; and it is conceivable that the inconsistency of the statements themselves may turn out to be superficial only, or that the error may have been based not on dishonesty or poor memory but upon a temporary misunderstanding. To this end it is both logical and just that the explanatory circumstances, if any, should be received."

§ 1045. "In making this explanation, it is obvious that in theory all that is allowable, where the witness wishes to show that the true

significance of the former statement has been distorted by a fragmentary repetition of it, is the addition of *such other parts of the statement as explain* its true significance,— and not the entire conversation or writing, which may contain portions wholly irrelevant for the legitimate purpose of explanation. Such is the rule in England. But "in the United States it is common to say that *the whole of the conversation,* or of the *former testimony or the deposition,* may be received."

"There is much to be said in favor of this looser doctrine, (1) because it affords a simpler test'and avoids a continuous and petty wrangle over the various parts of the conversation or deposition, and (2) because the possible disadvantage of introducing some irrelevant matter may well be borne by the party who provoked this result by attempting to introduce a fragmentary portion."

§ 2115. "The general phrasing of the principle, then, is 'that when any part of an oral statement has been put in evidence by one party, the opponent may afterwards (on cross-examination or re-examination) put in the remainder of what was said *on the same subject at the same time.'* This phrasing leaves something to be desired in definiteness, but it is practically applied without much difficulty and with little or no quibbling."

Defendant's counsel also takes the position that the statement of the doctor elicited from the witness on redirect examination was made in connection with a physical examination of the complaining witness concerning which no inquiry was made on cross-examination. It is urged that the physical examination to which the cross-examination referred was had after Millard had been arrested and bound over to the district court while the witness testified to a physical examination made before Millard's arrest. A strict grammatical construction of the cross-examination would tend to bear out this contention. However, the record is clear that there was only one physical examination of the complaining witness in connection with the Millard case.

Immediately after the cross-examination the witness, according to the version of defendant's counsel, was impeached as to her veracity in making the claim that Millard had raped her. Defendant's counsel promptly got his version of this examination before the jury in a statement made in connection with the dismissal of the Millard case. On this point the transcript discloses the following:

"Mr. Pearce: I don't see why we can't stipulate that the State's Attorney dismissed it, but what bearing has it upon the defendant?

"Mr. Sullivan: Nothing, only she swore that she had sexual intercourse with him, and the doctor examined her afterwards and the doctor swore that she never had intercourse with anybody and the state's attorney dismissed the case."

In the wrangling between counsel that ensued over her testimony on redirect examination counsel took the position that he did not ask for a statement of any conversation between the witness and the doctor. Counsel said: "In other words, I asked her what the doctor told. I did not ask her what the doctor said to her." After further discussion between counsel the court said: "It seems to me she had a perfect right to presume you asked her what he told her at the time of the examination, and if so, I think the State should be allowed to show what he did tell her. I don't think it would be admissible under any other theory unless they brought it out."

Later and at the time the disputed testimony was admitted, the grounds of defendant's objection included "that it is entirely hearsay, in that it undertakes to produce the testimony of the doctor in the form of a statement by this witness as to an examination concerning which no inquiry was made on the cross-examination." It is confusing to read the transcript. It is no reflection on anyone to say that by this time the witness, counsel and even the court may have been somewhat confused as to just what was intended by the questions propounded on cross-examination. However, it appears clearly that there was but one physical examination of the complaining witness by a doctor after the Don Millard rape. The answers of the witness on cross-examination had reference to what the doctor said at the time of that examination. By his questions on cross-examination defendant's counsel, asked for testimony that was purely hearsay and improper cross-examination. His reference to what the doctor said about her condition "at that time" was misconstrued by the witness to mean the time the rape occurred rather than the time of the examination of her person. Thus, her reply as to what the doctor said seemed extremely damaging to her credibility. Counsel for the state had a right to rehabilitate that credibility by having her explain her answer. She had stated a part of what the doctor said concerning her physical condition on cross-

examination. The trial court was faced with the problem of determining how far her explanation should go. He permitted her to testify to all the doctor said about her condition. In view of the circumstances surrounding this examination, it was within his sound judicial discretion to overrule defendant's objections and permit the witness to testify as she did. His rulings thereon were not erroneous.

BURR, J., concurs.

NUESSLE, J. (concurring). I am of the opinion that the redirect examination of the complaining witness on account of which appellant predicates error was improper, but I think that even if there was error in this respect it was not prejudicial. I therefore concur in the foregoing opinion.

CHRISTIANSON, J. (dissenting). In this case there are two appeals: one from the judgment of conviction and the other from an order denying defendant's motion for a new trial. The two appeals were consolidated and briefed and submitted together. The motion for a new trial was based, among others, on the grounds: (1) that the verdict is against the evidence, and (2) that new evidence has been discovered material to the defendant's defense which he could not with reasonable diligence have discovered and produced at the trial. In support of the latter ground, numerous and rather voluminous affidavits were submitted. In the briefs and on the original argument the greatest stress was placed on the questions raised on the appeal from the order denying a new trial, and particularly on the claimed insufficiency and the unsatisfactory character of the evidence, and on the newly discovered evidence. For reasons stated in the original opinion, this court had no authority to consider or determine the questions raised on the appeal from the order denying a new trial and was restricted to a consideration of the errors assigned on the appeal from the judgment.

The state of the record thus presented necessarily greatly limited the questions that this court might consider. The court could not determine the assignments challenging the sufficiency of the evidence or those based upon the newly discovered evidence. Indeed, the only questions presented for review on the appeal from the judgment related to rulings on admission of evidence, and the conclusion was reached

that the rulings specified as error had not prejudicially affected the rights of the defendant and that the judgment of conviction should be affirmed.

Thereafter the defendant petitioned for a rehearing. In such petition, much stress was laid upon the error assigned on the admission of certain testimony given by the complaining witness upon her redirect examination. After careful consideration, this court determined that the decision that had been rendered, holding that this court is without authority to consider or determine the merits of the appeal from the order denying a new trial, was correct and that no rehearing would be had as to that appeal. As to the appeal from the judgment, however, and particularly with respect to the contention advanced by the defendant that error prejudicial to his rights had been committed in the admission of certain testimony upon the redirect examination of the complaining witness, the court determined that such question ought to be re-examined and that the ends of justice required that a rehearing be had for that purpose.

The reargument was devoted almost exclusively to the question whether error prejudicial to the rights of the defendant had been committed in admitting the testimony of the complaining witness as to certain statements which she claimed were made by the doctor who examined her in connection with the charge for rape claimed to have been committed upon her by one Don Millard in 1939.

After careful examination of the record and the authorities, I am of the view that the evidence was not admissible, and that in light of the facts in the case, its admission must be deemed error prejudicial to the rights of the defendant which operated to deprive him of the fair trial to which he is entitled under the laws of this state.

The facts necessary to an understanding of the question under consideration may be stated substantially as follows: The defendant served as Superintendent of the State Training School of the State of North Dakota for more than twenty years. He was such superintendent during the year 1940. On January 17, 1940, one Anna Fluvog was committed to the State Training School by the Juvenile Court of Cass county. At the time of her commitment she was between fourten and fifteen years of age,—she became fifteen years of age on the 27th day of May of that year. On her direct examination she testified that on

March 8, 1940, the defendant took three of the girl students at the school in his car to the State Basketball Tournament at Bismarck, and that upon returning from the tournament in the late afternoon of that day, the defendant stopped his car in front of the main office building at the State Training School. The office of the superintendent is in this building. That the superintendent and the three girls went into the superintendent's office and that he offered each of the girls a cigarette and also brought out a box of candy; that each of the girls took and smoked her cigarette and also took some candy. That the three girls all remained there long enough to smoke their cigarettes and that thereafter the defendant "excused the other two girls and asked me to come back." That thereupon the other two girls went out of the superintendent's office and she remained in the office with the defendant. That she then asked the defendant why he called her back, and that he said he wanted to talk to her about Don Millard.

Thereupon, the following questions were asked and answers given:

"Q. Who was Don Millard?

"A. He was the man that we had a trial in 1939.

"Q. In which you were a witness, the complaining witness, were you not?

"A. Yes, sir.

"Q. Was that tried in the district court?

"A. Just a preliminary hearing.

"Q. What was the charge against Don Millard?

"A. Rape.

"Q. That was rape against you?

"A. Yes.

"Q. That had taken place in 1939?

"A. Yes.

"Q. About how long before the time we are speaking of now?

"A. I would say about a year.

"Q. You say there had been a preliminary hearing in that case?

"A. Yes.

"Q. Has there ever been a trial in district court?

"A. No.

"Q. Is that case still pending?

"A. Yes."

At this point counsel for the defendant said: "That is asking for a conclusion, is it not? That's a matter of record." To this the attorney for the state, who was conducting the examination, replied: "I suppose in a way it is." Thereupon the attorney for the defendant said: "We object to it on the ground that it is not the best evidence, because the case is not pending. The case has been dismissed." The attorney for the state then said: "Of course, as you say that would be a matter of record and the record is not here." The attorney for the defendant replied: "I have the record right here in the courtroom. I was afraid maybe you might suggest that." The attorney for the state then said: "I don't object to it." The court then stated: "I will sustain the objection."

Thereupon the attorney for the state proceeded with his examination of the witness, and she testified that the defendant had sexual intercourse with her, shortly after he said he wanted to talk to her about Don Millard; and that a little later he had sexual intercourse with her again.

On the cross-examination of the complaining witness, Anna Fluvog, the following questions were asked by defendant's attorney, and she made the following answers thereto:

"Q. Now, Mr. Pearce asked you—I think you said that you talked to Mr. McClelland about a Don Millard case?

"A. Yes."

"Q. You testified in that case that you had intercourse with Millard, did you not?

"A. Yes."

"Q. Then the man was bound over to the district court?

"A. Yes, sir.

"Q. Then afterwards his bail was reduced a time or two, was it not?

"A. I don't know.

"Q. Did you have any physical examination after that?

"A. Yes, I did.

"Q. By a doctor?

"A. Yes, sir.

"Q. And the doctor told that you never had intercourse with anybody up to that time?

"A. Yes, he did.

"Q. And testified and certified to the court that you never had intercourse with anybody up to that time. Is that not true?

"A. Yes.

"Q. And then the case was dismissed, was it not?"

The attorney for the state objected to the last question as not the best evidence; that the attorney for the defendant had said the record is the best evidence. The attorney for the defendant then said: "All right, let's get the record. Will you stipulate that the case was dismissed upon motion of the state's attorney on the 26th of November, 1941?" After some colloquy between the attorneys, the attorney for the state said: "We will stipulate that Mr. Sullivan (defendant's attorney) has presented in court what appears to be the original from the clerk's office of the district court of Cass county, North Dakota, a motion for the dismissal of the case of state of North Dakota against Don Millard, dated the 26th day of January, 1941, by Roy K. Redetzke, as state's attorney, and the order granting the motion to dismiss, signed by Hon. M. J. Englert, District Judge, but we are not stipulating as to the facts which brought about that motion, and we are not stipulating that the doctor made a certificate, and there is not a certificate in the record."

Upon redirect examination she testified that the examination by a doctor, concerning which she had been questioned on cross-examination, was made the day after she had been raped by Don Millard. Upon such redirect examination she was asked questions and gave answers thereto as follows:

"Q. What time was that (the examination by the doctor) in relation to the time when this rape was to have occurred by this Don Millard?

"A. I was raped at night and the next day I went to the doctor."

. . . . . . . . . . . . . . . . .

"Q. And there was a preliminary hearing, was there not?

"A. Yes, sir."

. . . . . . . . . . . . . . . .

"Q. Did the doctor testify at that preliminary hearing?

"A. No, he did not.

"Q. Did you ever hear of or see any written certificate by the doctor like Mr. Sullivan talked about this morning?

"Defendant's attorney: We object to that unless you want to impeach your own witness.

"The court: Objection overruled.

"A. I did not understand him this morning. I thought he meant before. He asked me if I had sexual intercourse. I thought he meant before the doctor examined me.

"Q. You told Mr. Sullivan, as we understand it, this morning, that he asked you if it was not true that the Doctor made a certificate to the effect that you had never had sexual intercourse?

"A. Yes.

"Q. What did you mean by that answer?

"Defendant's attorney: Objected to on the ground that it is calling for the conclusion of the witness.

"Q. Were you mixed up when you made that answer?

"A. Well, I thought he asked me if I had sexual intercourse and the doctor said I never did have before I had that sexual intercourse with Don Millard."

. . . . . . . . . . . . . . . .

"Q. Now as to this examination that was made by you, or of you by Dr. Schatz, where was that done?

"A. In Dr. Schatz's office in West Fargo.

"Q. Who else was there at the office with you and the doctor?

"A. My mother.

"Q. Was your father there?

"A. Yes, he was.

"Q. And did your hear the doctor make some statement as to your physical condition to your father and mother?

"A. Yes, he said—"

At this point, defendant's attorney interrupted the witness and interposed an objection to the question on the ground that the testimony sought to be elicited was hearsay. After statements by counsel, the court announced its ruling as follows: "I think at this time I will sustain the objection, but will allow you to investigate."

After colloquy between counsel, the court further stated: "I will

give you a chance to present your authorities on that." The attorney for the state then proceeded with his examination of the witness as follows:

"Q. Did you talk to your attorney concerning this affair in 1939 when your father signed this complaint in the case against Don Millard?

"A. What attorney?

"Q. The State's Attorney.

"A. Yes, Mr. Redetzke.

"Q. He was assistant state's attorney?

"A. Yes.

"Q. Did you ever take back or retract or deny any statement that you made at that time?"

Defendant's counsel objected to the last question but the objection was overruled and the witness answered:

"A. I never took back anything."

Thereafter the witness was examined further, but no attempt was made to have her testify to the statements claimed to have been made by the doctor at the time of her examination. Another witness was also examined. At the conclusion of the proceedings on that day, the court said: "Gentlemen of the jury, it seems that we can probably make better time by recessing now until tomorrow morning to give the attorneys a chance to prepare the rest of the case." He then proceeded to give to the jury the usual cautionary instruction. When court convened on the following morning, the court said: "Court will come to order. Well, perhaps the best way to do would be to excuse the jury and argue this matter. Bring up the cases that you have on it so that Mr. Sullivan can look at them. Gentlemen of the jury, I think we will excuse you a little while while the counsel argues the legal point that they brought up here yesterday. You will just step outside out of hearing during that time."

Thereupon arguments were made on the question of admissibility of the evidence. After the arguments had ended, the jury was called in and the attorney for the state, referring to the testimony previously given by the witness that her father and mother were present at the doctor's office when she was examined by the doctor, asked "what were the statements made by the doctor at that time?" Defendant's counsel

objected to this question on the grounds, among others, that this called for testimony relating to something not covered by the cross-examination of the witness; that the testimony called for was incompetent, irrelevant, immaterial and self-serving; that it is entirely hearsay, and that it undertakes to produce the testimony of the doctor in the form of a statement by the witness. The court overruled the objection.

Thereupon the witness answered the question and the examination proceeded as follows:

"A. The doctor said that I was so ripped and torn that if my father did not report it, he would do it.

"Q. What else did he say?

"Defendant's Attorney: The same objection.

"A. He said—he made the statement that he would report it if my dad did not, and that my condition was terrible.

"Q. Now Mr. Sullivan asked you and you replied when he asked you this question: "And the doctor told that you never had intercourse with anybody up to that time," and you answered: "Yes, he did." What was the statement the doctor made in connection with that?

"A. He said I had never had intercourse up to the time Don Millard did it.

"Defendant's Attorney: Same objection to that statement, to that question as to the two previous questions."

"Q. When Mr. Sullivan asked you the question I have just read to you: "And the doctor told that you never had intercourse with anybody up to that time." And you answered: "Yes, he did," then Mr. Sullivan asked you this question: "And testified and certified to the Court that you never had intercourse with anybody up to that time. Is that not true?" And your answer was: "Yes." In your answer what time did you have reference to in connection with Mr. Sullivan's question, "Up to that time"?

"A. Up to the time before Don Millard had sexual intercourse."

Did the trial court err in allowing the witness to testify as she did on the redirect examination and, if so, did such improper redirect examination result in prejudice to the substantial rights of the defendant? Those are the questions presented on the rehearing.

The real purpose of a redirect examination is to allow the witness

to explain and clarify statements made on the cross-examination which tend to create doubts and to contradict matters drawn forth on the direct examination; and to explain, clarify and modify statements made on cross-examination concerning collateral matters that were not alluded to on the direct examination (such as questions affecting only the credibility of the witness), and were first brought out on the cross-examination. 5 Chamberlayne, Modern Law of Evidence, p. 5346; 70 CJ pp. 698 et seq.; 6 Jones, Commentaries on Evidence, 2d ed., pp. 4871, 4872.

Where a witness misunderstood a question on cross-examination and thus through inadvertence gave an answer that did not represent what the witness intended to say and thought he was saying, it is permissible for the witness on redirect examination to correct the mistake. On redirect examination a witness may be asked questions "to draw forth an explanation of the sense and meaning of the expressions used by the witness on cross-examination, if they be in themselves doubtful; and also of the motive of which the witness was induced to use those expressions; but he has no right to go further and introduce matter, new in itself, and not suited to the purpose of explaining either the expressions or the motives of the witness." 6 Jones, Commentaries on Evidence, 2d ed., p. 4872.

Where the redirect examination relates to matters relevant to the issues in the case, and which were inquired about on the direct examination and on the cross-examination, the scope of the redirect examination is naturally wider than where the redirect examination relates to a collateral matter that was brought into the case for the first time on the cross-examination,—such for instance as questions affecting only the credibility of the witness.

The redirect examination in question here involved a matter brought out for the first time upon cross-examination, and which affected only the credibility of the witness. Whether the complaining witness had been outraged and subjected to violence by Don Millard in 1939 clearly would be wholly irrelevant upon the question whether she had or had not been ravished by the defendant in March, 1940. I fully agree with what is said in the opinion on the rehearing prepared by the Chief Justice that if the testimony of the witness offered upon redirect examination as to the doctor's statement said to have been made at the time

of the examination had been "offered on examination in chief it would clearly have been objectionable" on the grounds that it was "hearsay and irrelevant to any issue in the case."

It is true the trial court is vested with discretion as to the conduct and extent of a redirect examination; but this is not an unlimited or personal discretion; it is "a legal discretion to be exercised in conformity with the spirit of the law," to the end that there may be a fair trial, and substantial justice subserved. "Courts are mere instruments of the law," said Chief Justice Marshall (Osborn v. United States Bank, 9 Wheat. (US) 738, 866, 6 L ed 204, 234), "and can will nothing. When they are said to exercise a discretion, it is a mere legal discretion; a discretion to be exercised in discerning the course prescribed by law, and when that is discerned it is the duty of the court to follow it. Judicial power is never exercised for the purpose of giving effect to the will of the judge; always for the purpose of giving effect . . . to the will of the law."

When a witness has been cross-examined as to a conversation, the witness on redirect examination may give such further details or parts of the conversation as are connected with the statements elicited on cross-examination and essential to a correct understanding of the whole utterance; but the witness may not on redirect examination give parts of the conversation remote from those inquired about on the cross-examination, and which are not essential to an understanding of the parts related, or the expressions made by the witness on the cross-examination. Jones, Evidence (Pocket ed) 3d ed. § 873; 7 Wigmore, Evidence, 3d ed. §§ 2094, 2113, 2115, 2119; Ballew v. United States, 160 US 187, 40 L ed 388, 16 S Ct 263; State v. Pratt, 114 Kan 660, 220 P 505, 34 ALR 189; Karnes v. State, 111 Neb 435, 196 NW 676; Wilder v. People, 86 Colo 35, 278 P 594, 65 ALR 1260; Schaser v. State, 36 Wis 429; Gold v. United States (CCA 2d) 26 F(2d) 185; Wagner v. People, 30 Mich 384; Croft v. Thurston, 84 Mont 510, 276 P 950.

Reference has been made to statements in Wigmore on Evidence, 3d ed. to the effect that "in the United States it is common to say that the whole of the conversation, or of the former testimony or the deposition, may be received" (§ 1045); and "that when any part of an oral statement has been put in evidence by one party, the opponent may after-

wards (on cross-examination or re-examination) put in the remainder of what was said on the same subject at the same time." § 2115.

Professor Wigmore, however, also, shows quite clearly the inherent limitations upon these general statements. He says: "The opponent, against whom a part of an utterance has been put in, may, in his turn, complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance." § 2113.

"But what is *the whole* of the utterance ? . . . The whole that is to be considered is obviously not the whole of a phrase or a paragraph, any more than it is the whole of the printer's line or page, but the whole of the thought,—that is, such a quantity of utterance as the utterer has indicated to be distinct and entire in itself, for the purpose of representing a distinct thought." § 2094.

"In the definition of the limits of this right (the right of the opponent to put in the remainder of an utterance against whom a part of an utterance has been put in), there may be noted three general corollaries of the principle on which the right rests, namely:

"(a) *No utterance irrelevant to the issue* is receivable;

"(b) *No more of the remainder of the utterance than concerns the same subject, and is explanatory of the first part,* is receivable;

"(c) *The remainder* thus received merely *aids in the construction of the utterance as a whole,* and is not in itself testimony.

"(a) First, then, *no utterance irrelevant to the issue* is receivable.

"This limitation is obvious enough; because the sole purpose in listening to the remainder is to obtain a correct understanding of the effect of the part first put in; and no remaining part, even if contained in the same breath or the same writing, can furnish such aid if it is wholly irrelevant to the issue." . . .

"(b) Secondly, *no more of the remainder of the utterance than concerns the same subject, and is explanatory of the first part,* is receivable.

"This limitation is the logical result of the principle on which the rule rests." . . .

"The single purpose of considering the utterance as a whole is to be able to put a correct construction upon the part which the first party relies upon, and to avoid the danger of mistaking the effect of a fragment whose meaning is modified by a later or prior part (ante, § 2094).

It follows that the purpose is accomplished when the tribunal has had placed before it the remaining parts which may modify or explain the first part." . , .

"(c) Thirdly, *the remainder thus received merely aids in the construction of the utterance as a whole, and is not in itself testimony.*

"This, also, is simply a necessary deduction from the general principle. The remainder of the utterance, regarded as an assertion of the facts contained in it, is merely a hearsay statement, and as such has no standing. It is considered by the tribunal merely in order to piece out and interpret the first fragment and ascertain whether as a whole the sense of the first becomes modified." Section 2113.

In this case, however, there is no claim that there was elicited from the witness on cross-examination fragments of a conversation, which were correct so far as they went, but which would be misleading unless the other and remaining portions of the conversation were put in. The claim is that the witness misunderstood two questions and because of such misunderstanding gave incorrect answers. The defendant did not go into a conversation between the complaining witness and the doctor. His questions did not even assume there was such a conversation. He assumed that the doctor after the examination had made a certain pronouncement and had "testified and certified to the court" that she "never had intercourse with anybody up to that time." He did not ask her what took place at the time of the examination, what the doctor did, what questions he asked, or what, if any, conversation was had. The only inquiries made of the witness on the cross-examination as to any statement or pronouncement made by the doctor concerning the examination were these two questions:

(1) "And the doctor told that you never had intercourse with anybody up to that time?"

(2) "And testified and certified to the court that you never had intercourse with anybody up to that time. Is that not true?"

The witness answered both of these questions in the affirmative. The only part of the questions that she claims to have misunderstood are the words "up to that time." She says that she understood those words to have reference to the time she was ravished by Don Millard and not to have reference to the time the physical examination was

made. This is the only point on which she claims to have been "mixed up" and confused.

This point of misunderstanding she was entitled to explain, but it was wholly improper to permit her on the theory of explaining the error she says she made because of her misunderstanding of those words to introduce hearsay statements that clearly would have been incompetent, irrelevant and inadmissible if offered on the direct examination.

Her misunderstanding was fully explained and the resulting error fully corrected in her answers to the following questions propounded to her by the counsel for the state:

"Q. Now Mr. Sullivan asked you and you replied when he asked you this question: "And the doctor told that you never had intercourse with anybody up to that time," and you answered: "Yes, he did." What was the statement the doctor made in connection with that?

"A. He said I had never had intercourse up to the time Don Millard did it."

. . . . . . . . .

"Q. When Mr. Sullivan asked you the question I have just read to you: "And the doctor told that you never had intercourse with anybody up to that time," and you answered: "Yes, he did," then Mr. Sullivan asked you this question: "And testified and certified to the court that you never had intercourse with anybody up to that time. Is that not true?" and your answer was: "Yes." In your answer what time did you have reference to in connection with Mr. Sullivan's question, "Up to that time"?

"A. Up to the time before Don Millard had sexual intercourse."

The testimony on redirect examination did not merely extend to correcting the erroneous answers which she said she gave because of her misunderstanding what was meant by the words "up to that time." Her testimony went much farther. It brought into the case as positive testimony the hearsay statements of the doctor as to the injury she had sustained at the hands of Don Millard and the violence which the doctor's statement showed that she had been subjected to at that time and the "terrible condition" in which she had been left by her assailant. It also brought into the case, as positive testimony, the hear-

say statement of the witness that the doctor, in effect, had directed prosecution of Millard to be instituted, and that he informed her father that if the father did not do so, he, the doctor, would act.

It seems to me that the testimony of the complaining witness on redirect examination as to the statements, which she said the doctor made at the time of the examination, constituted improper redirect examination, and resulted in the admission of hearsay statements, not waranted by the cross-examination. It seems to me, also, that in light of the record here, and the nature of the case, it can not be said that the admission of such testimony had no effect upon the verdict.

The very nature of the case, and the positions occupied respectively by the defendant and the complaining witness, tended to create a prejudice against the defendant and sympathy for the complaining witness. This has been recognized and commented on by eminent observers and legal writers. 3 Wigmore, Evidence, 3d ed. p. 459.

The jury must have been impressed that this was testimony of the most vital importance. They knew that there was much controversy as to whether it should be admitted. They knew that the state had made strenuous effort to have it admitted, and that the counsel for the defendant had strenuously opposed the admission. They knew that they were excused for some time so that the question of admissibility might be argued in their absence. Upon no other testimony received in the case had so much attention been focused.

It would only be natural for the jury to have been on the alert and to have paid particular attention to the testimony when it was admitted; and there was no instruction limiting the purpose for which the testimony might be considered.

As to the appearance of the complaining witness, and her demeanor on the witness stand, the trial judge made the following observation in his memorandum decision: "The complaining witness was a little girl, rather attractive and not in any way brazen in appearance or demeanor. Her testimony was given straightforward, at times somewhat hesitatingly and with some crying at the crucial point."

At the time the complaining witness gave her testimony on redirect examination as to the statements made by the doctor, the jury had before them her testimony to the effect that she had talked with the prosecuting attorney, concerning the attack made on her by Millard;

that the prosecuting attorney thereafter had caused Millard to be arrested; that Millard was held for trial; and that she had never taken back, retracted or denied any statement she had made to the prosecuting attorney—that she "never took back anything." The jury, also, had before it the stipulated fact that the criminal action against Millard had been dismissed, and consequently that the man who, according to the testimony of the complaining witness, and the "hearsay testimony" of the doctor, had deflowered the complaining witness and brutally injured her physically, had been permitted to go scot-free. It seems to me that it cannot be said that the admission of the hearsay statements of the doctor, given by the complaining witness, had no effect upon the jury, and did not operate to deprive him of a fair trial. Anderson v. State, 85 Tex Crim Rep 422, 214 SW 353; People v. Caruso, 246 NY 437, 159 NE 390.

This is not a case where the defendant, in effect, has admitted his guilt, or where guilt has been established so clearly and conclusively that it might be said that the defendant could in no event have been prejudiced by the erroneous rulings of the trial court. (State v. Flath, 61 ND 342, 237 NW 792; People v. Caruso, supra; Gold v. United States (CCA 2d) 26 F(2d) 185, 186.)

The State's case rests almost wholly upon the testimony of the complaining witness. The only corroboration of such testimony (on the main question in the case) is the testimony of another girl student in the Training School tending to show that the defendant had opportunity to commit the crime at the time and place the complaining witness says it was committed. The defendant flatly contradicted the testimony of the complaining witness, and there was testimony of a student in the school and of two employees tending to corroborate the defendant, and to show that the criminal acts charged to have been committed by the defendant could not have been committed by him at the time and place testified to by the complaining witness.

Anna Fluvog was committed to the State Training School by the Juvenile Court of Cass county on January 17, 1940. She was taken to the Training School by the policewoman in the city of Fargo and entered the Training School about January 23rd. At the time of her commitment she was between fourteen and fifteen years of age,—she became fifteen years on the 27th of May of that year. Two other girls

were committed at the same time. These girls were members of a group that had stolen goods from a number of stores in Fargo. On March 7, 8, and 9, the State High School Basket Ball Tournament was held at the Memorial Building at Bismarck, some seven and one-half miles from the main office building of the State Training School. One of the boys at the State Training School, who was taking instruction in the Mandan High School, was a member of the Mandan High School Basket Ball team which played in the tournament. A number of the officers and instructors at the Training School had season tickets for the tournament and arrangements were made so that students at the Training School might attend the tournament games played during the day time. On March 8th the defendant took three of the girl students in his car to the state tournament. They were, Gladys Mc-Cullough, Elva Kolcgraff, and Anna Fluvog. They left the school at Mandan about 1:30 P.M., Mountain Time, and came directly to the Memorial Building in Bismarck, obtained their seats and saw the afternoon games. The games at the tournament were broadcasted over KFYR, the local radio station at Bismarck, and as a result the time of the beginning and closing of the games might readily be ascertained. The afternoon games ended at approximately 4:30 P.M., Mountain Time. After the games had ended, the three girls met the defendant immediately in front of the building and went with him to where his car was parked. Two other girls rode back to Mandan in the car. After reaching Mandan the defendant stopped to let these two girls out of the car, and then proceeded to the Training School. He stopped in front of the Main Office building. The administrative offices, including the office of the superintendent, are in this building. There are, also, two classrooms and some rooms used for dormitory purposes for boys in the building. The superintendent's office is directly off the front steps.

The complaining witness, Anna Fluvog, testified that the superintendent and the three girls went into the superintendent's office. That after they had entered the office he offered each of the girls a cigarette, and also brought out a box of candy. That each of the girls took and smoked her cigarette and also took some of the candy. That all three girls remained there long enough to smoke their cigarettes, and that thereafter the defendant "excused the other two girls and asked me

(Anna Fluvog) to come back." That thereupon the other two girls went out of the office and that she remained in the office with the defendant. That the office is not a large one; that there were two desks in the office, "a desk in the corner with a roll top and one flat desk," and that the superintendent's chair was between the two desks. That there were two doors in the office,—one leading into the hall and the other into the larger and main business office of the school. That the two girls left through this latter door, and that the defendant shut the door but did not lock it. That the defendant then asked her to come near him and that he then lifted her up and placed her in a sitting position on the roll top desk. That at the time he was sitting in his chair. That she then asked him why he called her back and he said he wanted to talk about Don Millard. That Don Millard was a man who had been charged with having committed rape on her in 1939— about a year before. That the defendant then said: "How did it start between Don and you?" That she can't remember what answer she made. That thereupon the defendant pulled her "down off the desk" onto his lap, and that after pulling up her dress and removing an undergarment he pushed her back on the desk so she was lying on her back, and that thereupon "he got up on top" of her and had sexual intercourse with her. That after this had taken place he let her off the desk.

"Q. And did you stay in the room for any length of time?

"A. Yes I did.

"Q. What took place next?

"A. Some time later he did it again.

"Q. You say he did it again. What do you mean by that?

"A. He had sexual intercourse again.

"Q. After this second instance took place, what did you do?

"A. I don't remember how I got out of the office. Anyway I ran out of the office. I went outside and met the girls and I went back to Devine Hall. I left the office by the front door. The girls I met were the two I had been with all afternoon,—Elva Kolegraff and Gladys McCullough. They were on the front steps, and I went with them to Devine Hall."

Both Elva Kolegraff and Gladys McCullough were called as witneses. Elva Kolegraff was called as a witness by the state. Gladys

McCullough was not called by either side but was called by the court. Both testified as to the trip to Bismarck and that after their return they went with the defendant into his office and that he offered each of them a cigarette and some candy and that each of them took the cigarette offered and smoked it while in the office; also that they took some candy. Elva Kolegraff testified that after they had smoked their cigarettes the defendant excused them and then called Anna Fluvog back and that she remained in the office with the defendant while she and Gladys went out and sat on the steps and waited for Anna. That later when Anna came out her hair was mussed and she was "crying terribly." That the three girls then went back to Devine Hall where they were late for supper with the other girls, and that the three girls had supper together in the dining room. Gladys McCullough testified that the three girls went from the office building to Devine Hall together and that on the way over Anna Fluvog told them that at the Basket Ball Tournament she was seated between a priest and an intoxicated man. Gladys McCullough was first examined by the court and thereafter counsel for both the state and defendant were permitted to examine her as on cross-examination. On cross-examination by counsel for the state, she testified that she thought all three girls left the superintendent's office together but that she did not know for sure; but that they all walked from the building to Devine Hall together. That she does not remember whether they came out of the superintendent's office together.

She was also asked and gave answers to questions as follows:

"Q. Is it not true, or can you remember whether or not Anna stayed in there some time alone?

"A. I cannot remember of any time that she was with him alone.

"Q. Would you say that she was not in there alone?

"A. I said I cannot remember."

The testimony shows without contradiction and beyond all possible doubt that Anderson, one of the boys at the Training School, was a member of the Mandan High School Basket Ball team and that he played in the tournament games that evening. According to the testimony of Anderson and a young lady employed in the office, they got into the defendant's car in front of the main building and the defendant drove to his home on the Training School grounds where they had

supper and then all of them, together with the defendant's wife, drove to Bismarck for the tournament. The first tournament game was scheduled to commence at seven o'clock, Mountain Time, that evening and Anderson and the coach of the Mandan High School Basket Ball team testified that the players were required to be on hand not less than forty-five minutes before the game opened to dress and prepare for the game. The coach testified positively that he was certain that Anderson was there on time and that he must have arrived about 6:15, Mountain Time, and that he certainly would have noticed if Anderson or any player had not been there on time. There is not the slightest reason to disbelieve this uncontradicted testimony of the high school coach. If it had been untrue, it would have been relatively easy to have obtained witnesses to contradict it. We have this situation, therefore, that only about an hour and forty-five minutes elapsed between the afternoon games and the time Anderson, the member of the Mandan High School Basket Ball team, brought over by the defendant, reported at the Memorial Building in Bismarck. If the defendant committed the acts testified to by the complaining witness, then within the space of an hour and forty-five minutes he went from the Memorial Building to his car; drove that car some seven and one-half miles to Mandan; entered his office with the three girls and offered them cigarettes and candy and all three girls remained there long enough to smoke their cigarettes. He had some conversation with Anna and had sexual intercourse with her twice. He drove to his home where he and others had supper and he again drove some seven and one-half miles back to Bismarck. According to the testimony of the complaining witness, the door to the office remained unlocked while the criminal acts were being committed. There is no claim that there was any outcry. While the acts occurred, the two other girls were on the front steps, a relatively short distance from the room where the acts are said to have taken place. There is no claim that the defendant either had or sought to have sexual relation with the complaining witness at any other time. The complaining witness was released from the Training School on parole to a maternal aunt in Wisconsin on June 3d, 1940. She then went to live with such aunt in Wisconsin and remained there until she was interviewed by an attorney for the state and a former policeman from Fargo, working with the attorney for

the state, in September, 1941. After such interview, she was brought back to the state. On her cross-examination she stated that she had asked her father to see the defendant about permitting her to come back to Fargo and that she knew that her father had seen the defendant about this. That she did not like it in Wisconsin and wanted to be back home in Fargo. There is no claim that the complaining witness at any time made any complaint either to her parents or to her aunt or to anyone else about the criminal acts which she says had been committed by the defendant; and the complaining witness, of course, knew that if a man committed such acts he was subject to arrest, for she already had had an experience along that line.

The only direct corroboration of the testimony of the complaining witness is that of Elva Kolegraff. Her testimony corroborates the testimony of the complaining witness to the extent of showing that the defendant and complaining witness were alone in the defendant's office at the time the rape is alleged to have occurred and, hence, there was some opportunity for the defendant to have intercourse with the complaining witness; and also, as to the appearance of the complaining witness when she came out of the office. The witness, Elva Kolegraff, discloses that she was not friendly to the defendant. That after she was released from the school on parole, she sought his consent to marry and that he refused to give such consent.

Testimony was offered by witnesses for the defendant tending to show that the complaining witness could not have been in the office alone with the defendant for any appreciable time, if at all. Taking the evidence as a whole, it seems to me that it can not be said to be of such strong and convincing character that the erroneous admission of hearsay statements, of the nature received here, could not and did not affect the verdict. It seems rather that the evidence is of such character that an error like this might be likely to have had a controlling effect with the jury. People v. Caruso, 246 NY 437, 159 NE 390, and Gold v. United States (CCA 2d) 26 F(2d) 185, supra.

The complaining witness concededly was a delinquent—an errant girl. According to her own testimony, she and her confederates had engaged in rather extended thievery in Fargo. There is no claim that their activity was caused by need. She said: "We just did it for fun." It was not merely an isolated incident, where a girl pining for a piece

of finery thoughtlessly took it. She testified quite a few girls were involved, and that she and two others were sent to the Training School. That she stole quite a lot of things, and from many stores. That she took quite a few things home. She said, "I was trading off with my girl friends, so my mother did not suspect it. We traded off things." Certainly her sense of right and wrong was perverted. The very practice in which she had engaged—shoplifting—was one form of lying and deception, and according to her own testimony she deliberately planned and acted to deceive her mother.

Eminent criminologists, psychiatrists, lawyers and judges have frequently called attention to the danger that may lurk in criminal charges, especially charges of sex offenses, by young errant girls.

Professor Wigmore in his noted work on evidence (Wigmore, Evidence, 3d ed.) says:

"Modern psychiatrists have amply studied the behavior of errant young girls and women coming before the courts in all sorts of cases. Their psychic complexes are multifarious, distorted partly by inherent defects, partly by diseased derangements or abnormal instincts, partly by bad social environment, partly by temporary physiological or emotional conditions. One form taken by these complexes is that of contriving false charges of sexual offenses by men. The unchaste (let us call it) mentality finds incidental but direct expressions in the narration of imaginary sex-incidents of which the narrator is the heroine or the victim. On the surface the narration is straightforward and convincing. The real victim, however, too often in such cases is the innocent man; for the respect and sympathy naturally felt by any tribunal for the wronged female helps to give easy credit to such a plausible tale." p. 459.

"In charges of rape, incest, etc., where the complainant is a young girl, her credibility may be affected by her unchaste tendencies. False charges of the sort by girls of such tendencies are not uncommon. Unless that tendency is inquired into, the story becomes plausible, and many a man has probably gone to the penitentiary as the innocent victim of such tales." pp. 675, 676.

In a report made (1938) by the American Bar Association's Committe on the Improvement of the Law of Evidence—(the Committee's personnel consisted of five members (three being judges), some sixty-

five advisory members (one from each State and Territory, and fifteen at large, these being chiefly professors of the law of evidence)—it was said: "The penalties for sex-crimes are very severe,—justly so, in most cases. But the very severity of the penalty calls for special procedural precautions to protect an innocent accused from condemnation by unreliable testimony."

"Today it is *unanimously* held (and we say 'unanimously' advisedly) by experienced psychiatrists that the complainant woman in a sex offense should *always* be examined by competent experts to ascertain whether she suffers from some mental or moral delusion or tendency, frequently found especially in young girls, causing distortion of the imagination in sex cases."

"We recommend that in all charges of sex offenses, the complaining witness be required to be examined before trial by competent psychiatrists for the purpose of ascertaining her probable credibility, the report to be presented in evidence." 3 Wigmore, Evidence (3d ed.) p. 466.

As said, the questions presented on the rehearing are: (1) Did the trial court err in allowing the complaining witness to testify on redirect examination as to the statements claimed to have been made by the doctor? and (2) If so, did such improper redirect examination result in prejudice to the substantial rights of the defendant?

What I have said regarding the evidence as to the commission of the crime, and the character of the complaining witness, presupposes that her testimony on redirect examination was inadmissible and that the trial court erred in allowing it to be adduced. If such testimony on redirect examination was proper and admissible, then the discussion as to the nature and force of the evidence, and the character of the complaining witness would be pointless. As the majority of the court are of the view that the redirect examination was proper, they are not concerned with the factors which I have considered and naturally no reference was made thereto in their decision. From my standpoint, however, a different situation exists. Believing, as I do, that the challenged testimony admitted on redirect examination was irrelevant and inadmissible, and that the trial court erred in allowing it to be received,

the further question arises as to whether the defendant was prejudiced by such error, and that question can be answered only by a consideration of the evidence, and the state of the case as and when it was submitted to the jury.

For reasons stated, I believe that the testimony of the complaining witness on redirect examination, as to the statements which she testified were made by the doctor, was inadmissible and that, in light of the evidence and the record in the case, it can not be said that this evidence did not have influence with the jury and affect the verdict.

BURKE, J., concurs in the views expressed by Judge CHRISTIANSON.