**STATE of North Dakota, Plaintiff and Respondent,**

v.

**Johnnie WILSON alias Johnnie Williams, Defendant and Appellant.**

**Cr. 336.**

Supreme Court of North Dakota.

April 28, 1966.

Conmy, Conmy, Rosenberg & Lucas, Bismarck, for defendant and appellant.

Helgi Johanneson, Atty. Gen., and Albert A. Wolf, State's Atty., Bismarck, for plaintiff and respondent.

MURRAY, Judge.

This is an appeal by the defendant, Johnnie Wilson, alias Johnnie Williams, from a final judgment of conviction, of the crime of burglary in violation of Section 12–35–02 of the North Dakota Century Code.

We have no jurisdiction to entertain this appeal. Section 29–28–08, North Dakota Century Code provides that an appeal from a judgment may be taken within three months after its rendition, and, from an order, within sixty days after it is made.

The chronology of events in this case is as follows:

Verdict of conviction was returned on January 28, 1965.

Judgment of conviction was returned on February 1, 1965.

Order denying motion for new trial was issued on February 19, 1965.

Notice of Appeal herein was served on November 22, 1965.

■ Notice of Appeal was from the judgment alone, not from the order denying motion for new trial. This alone would have prevented appellant from raising the sufficiency of the evidence. See State v. McClelland, 72 N.D. 665, 10 N.W.2d 498.

In any case respecting the judgment appealed from the three months period had clearly elapsed, before notice of appeal was served.

The right of appeal is statutory, and an appeal must be taken within the time that the legislature has seen fit to provide. In the form of dictum, this is to be found in State v. McClelland, supra.

Under a markedly similar statute, the South Dakota Court so held in State v. Hueremann, 37 S.D. 649, 159 N.W. 398.

More directly, this Court has held, that

"An appeal from a criminal judgment must be taken within three months after its rendition." State v. Prince, (N.D.) 66 N.W.2d 796, at 799.

The Minnesota Supreme Court, in more recent and numerous decisions than our own, has adhered strongly to this principle. See, State ex rel. Elkins v. County of Ramsey, 257 Minn. 21, 99 N.W.2d 895; State v. Wiley, 260 Minn. 88, 108 N.W.2d 774.

However, for reasons hereinafter stated, we have examined the state of the record, and the evidence. This is a criminal case. Appellant is an indigent, whose appointed counsel defended him aggressively and with competence, and this appeal was taken *in forma pauperis* by leave of the court below. To determine whether this appellant's rights were protected and that he had his day in court, we have thoroughly examined the entire record, including physical examination of the exhibits.

The facts in this case are substantially as follows:

Charles Tighe, an attorney, resides with his wife, Dorothy Tighe, at 1108 West Highland Acres Road in Bismarck, North Dakota. The Tighes have no children. The Highland Acres Addition is a rather outlying residential district. To the west of the Tighe residence, there is a barren open area, owned and used by the North Dakota National Guard for its purposes, beyond which lie the main-line tracks of the Northern Pacific Railway Company. These railway tracks, in turn, continue westward via a bridge over the Missouri River into Morton County, North Dakota. This area of Morton County, although unincorporated, is commercially developed and borders on the east edge of the City of Mandan, North Dakota.

On the evening of Friday, December 11, 1964, Mr. and Mrs. Tighe left, via an evening train, for Fargo, North Dakota. They returned, via train, early on the morning of Sunday, December 13, 1964, and reached their home at approximately 4 A. M.

Prior to leaving, the Tighes had checked their doors and locks, and everything was in order. On returning, however, they found immediate evidence that an intruder had broken into their home.

The front door, although shut, was unlocked. In the main bedroom, bed clothing was disarranged. Two pillow-cases were missing, as were the contents of a liquor cabinet.

On the lower level of the home, a window on the southwest quarter of the house had been smashed. A basement door opening onto the ground level was ajar, being held open by an electric lantern which evidently

the intruder had placed there. An outer door was found open also. Having evaluated this situation, Charles Tighe phoned the police.

After calling the police, the Tighes made a further check, during which Mrs. Tighe found that a drawer containing jewelry had been virtually emptied. Neckties belonging to Mr. Tighe were missing from a closet rack.

Officers and detectives arrived and were at work on the case by 4:30 A. M.

The first clue noted were footprint type marks, barred in design, on the cement floor of the basement near the broken window of presumed entry. The Tighe's own stepladder was found emplaced by the broken window, outside the building. Pry marks found on the frame of the window of entry, were found to have been made by an instrument resembling a screwdriver and with a blade width of about one-quarter inch.

With the coming of daylight, officers of the Detective Bureau of the Bismarck Police Department, continued the investigation in a careful and methodical manner. They followed tracks which contained the same barred pattern above referred to, through the snow from the Tighe home, down over the barren National Guard area, to the Northern Pacific railroad tracks, thence along said tracks to a warming shack at the eastern end of the railroad bridge. To avoid confusion, we refer to this as Warming Shack #1. The tracks led into the shack. In the shack were found small boxes which had contained some of the Tighe jewelry stolen in the burglary. By digging around the stove in the shack, partially burnt jewelry boxes and items of jewelry, part of the Tighe loot, were also found.

In the course of this tracking, the detectives measured the barred tracks. The measurements were later compared with footwear worn by appellant when apprehended, and found to correspond generally,

although, no casts had been made of said prints.

The tracks continued onto the railroad bridge, were not discernible on the bridge due to less snow, but again resumed on the west, or far, end of the bridge. The tracks were followed off the railroad right-of-way at a Freeway overpass and thence along said then-uncompleted freeway towards a motel area. However, the tracks were lost in an area bare of snow and the trail could not again be immediately picked up.

The same tracks were again found in the motel area referred to and in the Mandan railroad yards, which is the site of the shack we shall hereinafter refer to as Warming Shack #2.

Two days after the burglary, on Tuesday, December 15, at approximately 5 A. M., the appellant was found in Warming Shack #2 in the Mandan railroad yards, in the physical possession of certain items of the Tighe loot. Other items of the loot were found hidden in close proximity to the shack. Two other persons, both railroad workers with legitimate business in the shack, were there also. Neither was acquainted with appellant, although they had obviously not objected to his presence there.

At that time, appellant told the arresting officers that he had arrived in Mandan about four hours previously on a freight train from Billings, Montana.

Besides the items of Tighe jewelry in his possession, appellant had in his pocket a broken screwdriver with a blade approximately one-quarter of an inch in width. Appellant told arresting officers that the items of jewelry in his possession, had been owned by him for about four years. This was a manifest falsehood, since the record shows they had been stolen from the Tighe home in the course of the burglary in question, two days previously.

Upon arrest, the appellant was wearing a certain pair of shoes, with a rib-type sole.

The measurements of the shoe, the sole, the ribs, and the distance between the ribs, did correspond to a high degree, with the prints made by the shoes of the burglar both in the Tighe home, and on his escape route to the railroad tracks and beyond.

It is true that no plaster cast was made of the prints found in the snow. By the following line of cross-examination, appellant's own counsel blocked Detective Wrona from explaining why this was not done:

"Q. Isn't it also a fact, Mr. Wrona, you never took a cast of these footprints?

A. I would like to answer that, explain it.

Q. You can answer that yes or no.

A. No, we didn't."

Although appellant had earlier told other officers that he had had the jewelry items in his possession for four years, he told the Sheriff of Morton County at the jail that he had won them in a poker or crap game while riding the freight, the preceding evening.

Appellant elected to take the witness stand in his own behalf. He identified certain of the loot items as having been found in his possession when arrested, and stated that he won them in a poker game, that "ended up a dice game" and occurred in the "railroad shack" by which it is certain he meant Warming Shack #2, the place of arrest. This game took place, appellant testified, "between 8:30 and 9:00 o'clock" on Monday evening, December 14. The other two alleged participants in the game were simply described as "two Mandan Indians." No further testimony whatsoever was offered to show the identity of these "Indians."

In appellant's possession when arrested were receipts indicating shipment of two packages from C. Roberts to C. Roberts, from Bismarck to Cheyenne, Wyoming, before the Tighe burglary, but we consider this neither relevant evidence nor prejudicial.

At no time did appellant make any confession nor any substantial admission against interest. He specifically denied the crime charged. His evidence also clearly indicates he felt he was treated in a friendly and kindly manner while in the custody of the Morton County (Mandan) Sheriff, witness Wingenbach.

In weighing the appellant's own testimony, the transcript on sentencing shows that the able trial judge (who had an opportunity, denied to us, to observe the appearance and demeanor of appellant on the stand) told appellant:

"* * * I think your story was just a little bit too good; I think that is the reason the jury didn't buy it. * * * and * * * sentencing you bothers me. I'm convinced in my own mind that the story you told on the witness stand was fabrication."

In the light of these facts, we turn now to the points raised on appeal, which are:

Did the Court err in allowing into evidence, over objection, the shoes of the defendant?

If wrongfully admitted, was the other evidence admissible against the defendant sufficient to sustain a conviction?

█ The trial court clearly did not err, either on the grounds specified in the objection, or on any other ground, in receiving Exhibit 9, (called variously both "boots" or "shoes") in the record.

█ On the second point, we specifically hold there was ample evidence to sustain a conviction.

We do deem it desirable to consider the role of circumstantial evidence in this case. Burglary is a crime essentially and necessarily committed by stealth and often by night. Eyewitnesses are rarely available.

The best statement of the role of circumstantial evidence, particularly as applied to this case, but also in general, is to be found at 1 Underhill's Criminal Evidence 16, et seq.

" * * *

The necessity for frequent resort to circumstantial evidence to prove guilt in criminal proceedings is apparent. By the nature of things, crimes are generally committed in secret, beyond the range of eyewitnesses.

* * *

No greater degree of certainty is required when the evidence is circumstantial than when it is direct, for in either case the jury must be convinced beyond a reasonable doubt of the guilt of the defendant. The law makes no distinction between direct evidence of a fact and evidence of circumstances from which the existence of a fact may be inferred. * * *

* * * Unexplained possession of the fruits of crime, recently after its commission, justifies the inference that the possession is guilty possession, and constitutes a prima facie evidence of guilt. * * *."

For the reasons heretofore stated, this appeal must be dismissed for lack of jurisdiction on appeal. However, we have allowed a full argument in this case and have considered the evidence and the specified errors of law, and find that even if we had jurisdiction of the appeal, the judgment would have to be affirmed.

Appeal dismissed.

TEIGEN, C. J., and ERICKSTAD, KNUDSON and STRUTZ, JJ., concur.