THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v. FRANCISCO CARUSO, Appellant.

Crimes — murder in first degree — trial — evidence — powers and duties of Court of Appeals on review of conviction — harmful appeals to sympathy or prejudice — erroneous reception of immaterial testimony — incompetent questions asked by prosecuting attorney — erroneous reception of immaterial expert testimony — insufficiency of evidence to sustain finding of deliberation and premeditation.

1. In reviewing convictions for murder in the first degree, the Court of Appeals has broad powers.  It is to see that justice is done both to the accused and to the State.  If guilt is clear, errors or instances of unfair conduct by the prosecutor may sometimes be ignored.  The greater the doubt of guilt, however, the more likely are errors to affect the substantial rights of the accused.  The more likely are appeals to sympathy or passion or prejudice to influence the jury.  It is the duty of the court, not only to weigh the evidence, but to grant a new trial if it be believed that justice requires such a course.

2. Where, upon trial of an indictment for murder in the first degree, accusing defendant of killing the attending physician, after the death of his child, facts necessary to constitute the crime, if they exist, must be inferred from the admissions of the accused and the

real issue is as to his state of mind at the time of the homicide, whether he formed the intent to kill and if so, whether the killing was the result of premeditation and deliberation, the issue must be decided by the jury in a judicial temper and appeals to sympathy or prejudice can be but harmful.

3. It was, therefore, reversible error to permit the widow of the deceased to give testimony which had no materiality upon the issues before the jury and which clearly constituted an appeal to prejudice. Nor can the error be overlooked where the object of the prosecution is emphasized by questions asked the defendant which were plainly incompetent.

4. It was also material error to receive testimony by an expert that the medical treatment of the child was correct and the doses not excessive. The belief of the accused as to these facts was the question, not whether his belief was mistaken. Nor did this testimony tend to corroborate the denial of another witness that he had ever told the accused that the dose was too large.

5. In any event conviction of murder in the first degree is not justified by evidence, which though sufficient to sustain a finding of intent to kill and showing sufficient time for deliberation and premeditation, shows that the attack was the instant effect of impulse induced by a supposed laugh on the part of the victim when told that the child was dead. Nor does the fact that the stabbing followed the beginning of the attack by some time affect this conclusion. It was all one transaction under the peculiar facts of this case. If the assault was not deliberated or premeditated then neither was the infliction of the fatal wound.

(Argued October 27, 1927; decided November 22, 1927.)

APPEAL from a judgment of the Kings County Court, rendered April 18, 1927, upon a verdict convicting the defendant of the crime of murder in the first degree.

*Walter H. Pollak, Charles A. Schneider, Howard Hilton Spellman, Ruth I. Wilson* and *Lewis A. Pinkussohn* for appellant. The People failed to establish a *prima facie* case of murder in the first degree. (*People* v. *Ingraham,* 232 N. Y. 245; *People* v. *Mongano,* 1 N. Y. Crim. Rep. 41; *People* v. *Barberi,* 149 N. Y. 256; *State* v. *Jarrott,* 23 N. C. 76; *People* v. *Raffo,* 180 N. Y. 434; *People* v. *Soper,* 243 N. Y. 320.) The verdict was against the weight of the evidence. (*People* v. *Creasy,* 236 N. Y. 205; *Noah*

v. *Bowery Sav. Bank,* 225 N. Y. 284.) The district attorney, over objections and exceptions, was allowed to prove that the deceased left a young widow and a small baby. The district attorney was permitted to expand this evidence and to present to the jury an affecting picture of the once united family whom Caruso had deprived of a husband and father. The reception of this evidence, irrelevant and in its effect inevitably inflammatory, was in the circumstances of this case error so prejudicial as to require reversal, the more clearly in view of the use the district attorney made of this evidence in his summing up. (*People* v. *Slover,* 232 N. Y. 264; *People* v. *Mulford,* 232 N. Y. 530; *People* v. *Koerner,* 154 N. Y. 355; *People* v. *Maine,* 166 N. Y. 50; *People* v. *Gerdvine,* 210 N. Y. 184; *People* v. *Ohanian,* 245 N. Y. 227; *People* v. *McGraw,* 66 App. Div. 372; *People* v. *Purtell,* 243 N. Y. 273; *People* v. *Colantone,* 243 N. Y. 134; *People* v. *Esposito,* 224 N. Y. 370; *People* v. *Wilcox,* 245 N. Y. 404; *People* v. *Fielding,* 158 N. Y. 542.) The court erred in receiving evidence that the treatment given the Caruso child was correct and that Dr. Pendola had been diligent, facts unknown to the defendant and having no bearing on his state of mind. (*Cole's Trial,* 7 Abb. Pr. [N. S.] 321; *Rayland* v. *State,* 125 Ala. 12; *People* v. *Harris,* 209 N. Y. 70; *People* v. *Soper,* 243 N. Y. 320; *People* v. *Sing,* 242 N. Y. 419.) Prejudicial error was committed by the district attorney in putting to the defendant questions concerning citizenship and union membership. (*People* v. *Conrow,* 200 N. Y. 356; *People* v. *Esposito,* 224 N. Y. 370.)

*Charles J. Dodd, District Attorney* (*Henry J. Walsh* of counsel), for respondent. The appellant's guilt was proved beyond a reasonable doubt. Premeditation and deliberation were abundantly established. (*People* v. *Ferraro,* 161 N. Y. 365; *People* v. *Schmidt,* 168 N. Y. 568; *People* v. *Koenig,* 180 N. Y. 155; *People* v. *Breen,* 181

N. Y. 493; *People* v. *Gilbert*, 199 N. Y. 10; *People* v. *Serimarco*, 202 N. Y. 225; *People* v. *Guadagnino*, 233 N. Y. 344.) The testimony of the wife of the deceased as to his conversation with her on the night before the homicide was not incompetent. (*People* v. *De Simone*, 225 N. Y. 261; *People* v. *Rodawald*, 177 N. Y. 408.) The testimony of Dr. Regan, the expert in contagious diseases, was relevant. (*People* v. *Harris*, 209 N. Y. 49.)

ANDREWS, J. This judgment must be reversed.

In reviewing convictions for murder in the first degree, the Court of Appeals has broad powers. It is to see that justice is done both to the accused and to the State. If guilt is clear, errors or instances of unfair conduct by the prosecutor may sometimes be ignored. The greater the doubt of guilt, however, the more likely are errors to affect the substantial rights of the accused. The more likely are appeals to sympathy or passion or prejudice to influence the jury. It is our duty, not only to weigh the evidence, but to grant a new trial if we believe justice requires such a course.

Francesco Caruso, an illiterate Italian, thirty-five years old, came to this country about 1911. He worked as a laborer, and in the early part of 1927 was living with his wife and six small children in an apartment in Brooklyn. On Friday, February 11th, one of these children, a boy of six, was ill with a sore throat. That day and the next he treated the boy with remedies bought at a drug store. The child grew worse and at ten o'clock of the night of the 12th he sent for a Doctor Pendola, who had been recommended to him, but with whom he was not acquainted.

What followed depends upon a statement made by Caruso and upon his testimony on the stand. Any proper inferences may be drawn therefrom. The belief that what he said was false, however, or any reasoning based upon his failure to call friendly witnesses, will not

1927.]          Opinion, per Andrews, J.          [246 N. Y. 437]

supply the want of affirmative testimony of the facts necessary to constitute the crime. Those facts if they exist must be inferred from his own admissions.

Sometime between ten-thirty and eleven in the evening Dr. Pendola arrived. The child had diphtheria. Caruso was sent out to buy some anti-toxin, and when he returned the doctor administered it. He then gave Caruso another prescription with instructions as to its use and left, promising to return in the morning.

Caruso watched the child all night, giving remedies every half hour. "About four o'clock in the morning," he testified, " my child was standing up to the bed, and asked me to, he says, ' Papa ' he said ' I am dying.' I say that time, I said, ' You don't die.' I said ' I will help you every time.' The same time that child he will be crazy — look like crazy, that time — don't want to stay any more inside. All I can do, I keep my child in my arms, and I held him in my arms from four o'clock until eight o'clock in the morning. After eight o'clock in the morning the poor child getting worse — the poor child in the morning he was "— (Slight interruption in the testimony while the defendant apparently stops to overcome his emotion.) " The poor child that time, and he was asking me, ' Papa,' he said, ' I want to go and sleep.'

" So I said, 'All right, Giovie, I will put you in the sleep.' I take my Giovie and I put him in the bed, and he started to sleep, to wait until the doctor came, and the doctor he never came. I waited from ten o'clock, the doctor he never came." Then after trying in vain to get in touch with the doctor he sent for an ambulance from a drug store. " When I go home I seen my child is got up to the bed that time, and he says to me, ' Papa, I want to come with you.' I take my child again up in my arms and I make him look to the back yard to the window. He looked around the yard about a couple of minutes and after, when he looked around, he says to me, ' Papa, I want to go to sleep again.'

" I said, 'All right, Giovie, I will put you in the sleep.'
I put my child on the bed. About a few seconds my child
is on the bed, my child says to me, he says, ' Papa, I
want to go to the toilet.'

" I said, 'All right, Giovie, I will take you to the toilet.'
So I was trying to pick up the child and make him go
to the toilet, when I held that child I felt that leg — that
child started to shake up in my arms. My wife know
about better than me — I cannot see good myself in the
face, so she tell what kind of shakes he do, and she has
told me, she says, ' Listen, Frank, why, the child has
died already.'

" I said, 'All right, you don't cry. No harm, because
you make the child scared.' That time I go right away
and put the child on the bed. When I put the child,
before I put my hand to the pillow, my child said to me,
' Good-bye, Papa, I am going already.'

" So that time I put my hands to my head — I said,
' That child is dead. I don't know what I am going to do
myself now.' That time I never said nothing, because
I said, ' Jesus, my child is dead now. Nobody will get
their hands on my child.' "

About twelve o'clock Dr. Pendola arrived. The child
had been dead for some time. He was told and then
Caruso says the doctor laughed and he " lost his head."
This seems incredible. Yet Caruso apparently believed
it for his testimony on the stand is a repetition of the
same charge made in his statement that same night,
before it is likely that a man of Caruso's mentality
would be preparing a false defense. The probability is
there was, from one cause or another, some twitching of
the facial muscles that might be mistaken for a smile.

Besides the delay of the doctor and the smile was
another circumstance which, if true, would exasperate
Caruso. He says, and again this appears in the statement
as well as in his testimony on the trial, that when he was
buying the anti-toxin the druggist told him that the dose

1927.] Opinion, per ANDREWS, J. [246 N. Y. 437]

was too large for a child of the age of his son. This he told the doctor. The latter was indignant and paid no heed to the warning. The druggist denied any such conversation and apparently the dose was proper. But it seems probable that something occurred that left on Caruso's mind the impression that the death of his child was caused by malpractice. At least, immediately after the death, he told an ambulance surgeon that Dr. Pendola had killed his child by an injection; and also complained of his delay in not coming that morning. And within a short time he made the same charge to others.

Then followed some talk. Caruso accused the doctor of killing his child. The doctor denied it. Caruso attacked him in anger, choked him until he fell to the floor, then went to a closet ten or twelve feet away, took a knife and stabbed him twice in the throat, so killing him. Caruso then took his family to the janitor's apartment downstairs, and himself went to his brother's house on Staten Island where he was arrested that night. He made no attempt whatever to conceal the facts of the homicide, and his departure cannot fairly be viewed as a flight, indicating consciousness of guilt.

The case for the People was simple. Formal identification of the dead body was required. That Caruso committed a homicide, neither excusable nor justifiable, was abundantly shown by his own statement and indeed was not denied. The real issue was as to state of mind of the defendant, whether he formed the intent to kill Dr. Pendola, and if so whether the killing was the result of premeditation and deliberation. What Caruso in fact believed and thought, what he had in mind at the time of the homicide, is the issue — not whether his beliefs were justified. And the jury, horrified at the conceded brutality of his acts, are still to decide this issue in a judicial temper. Appeals to sympathy or prejudice can but be harmful.

Mrs. Pendola, the widow of the deceased, was a young

woman, placed upon the stand by the State. The right to use her as a witness for a proper purpose is not questioned, notwithstanding the natural sympathy her presence would arouse. But she knew nothing of the circumstances of the crime. She might have been asked as to the identity of the deceased, although he could be identified by others. She might give any other material evidence notwithstanding any influence her presence might have upon the jury. Mrs. Pendola was not called for any such purpose. She was allowed to say she had been married for eighteen months, that she had one child, six months old, that her husband was a medical graduate; she explained why his call on Caruso was delayed on Sunday, the 13th; she gave conversations with the doctor when he received the telephone call from Caruso Saturday night and again after his return; she told how he sat on his baby's crib and sang her to sleep. All this had no materiality upon the issues before the jury. The object of the State is clear. Although, doubtless, the result of " well intentioned though misguided zeal," it was an " unseemly and unsafe " appeal to prejudice. Nor here can we overlook it as probably unheeded. And the object of the prosecution is emphasized by questions, ruled out it is true, as to whether the defendant was a citizen or had applied for naturalization. They were so plainly incompetent, it cannot be believed they were asked in good faith.

Testimony was given by an expert that the treatment of the child was correct and the doses of anti-toxin not excessive. The belief of Caruso as to these facts was the question, not whether his belief was mistaken. Nor did this testimony tend to corroborate the denial of the druggist that he had ever told Caruso that the dose was too large. (*People* v. *Harris*, 209 N. Y. 70.)

But passing the two questions already discussed, which would under the circumstances of this case require a reversal, there is also a fundamental reason requiring a

1927.] Opinion, per ANDREWS, J. [246 N. Y. 437]

new trial. Conviction here of murder in the first degree is not justified by the weight of the evidence. The jury might find that the intent to kill existed. While in his testimony on the stand Caruso denies such an intent and says that in his rage he did not know what he was doing, yet in his statement he expressly admits his intent to kill, and the inference that the intent existed might also be drawn from the two wounds in the neck inflicted with a large knife.

But was there premeditation and deliberation? This seems to have been the question which troubled the jury. They considered their verdict for six hours — twice returning for definitions of homicide and of deliberation and premeditation. Time to deliberate and premeditate there clearly was. Caruso might have done so. In fact, however, did he?

Until the Saturday evening Caruso had never met Dr. Pendola. Nothing occurred at that interview that furnished any motive for murder. Then came nervous strain and anxiety culminating in grief, deep and genuine, for the death of his child. Brooding over his loss, blaming the doctor for his delay in making the promised visit, believing he had killed the boy by his treatment, the doctor finally enters. And when told of the child's death he appears to laugh. This added to his supposed injuries would fully account for the gust of anger that Caruso says he felt. Then came the struggle and the homicide.

As has been said, Caruso had the time to deliberate, to make a choice whether to kill or not to kill — to overcome hesitation and doubt — to form a definite purpose. And where sufficient time exists very often the circumstances surrounding the homicide justify — indeed require — the necessary inference. Not here, however. No plan to kill is shown, no intention of violence when the doctor arrived — only grief and resentment. Not until the supposed laugh did the assault begin. " If the defendant inflicted the wound in a sudden transport of passion,

[246 N. Y. 437]     Opinion, per Andrews, J.     [Nov.,

excited by what the deceased then said and by the preceding events which, for the time, disturbed her reasoning faculties and deprived her of the capacity to reflect, or while under the influence of some sudden and uncontrollable emotion excited by the final culmination of her misfortunes, as indicated by the train of events which have been related, the act did not constitute murder in the first degree. Deliberation and premeditation imply the capacity at the time to think and reflect, sufficient volition to make a choice, and by the use of these powers, to refrain from doing a wrongful act." (*People v. Barberi,* 149 N. Y. 256.) When the supposed laugh came there was apparent cause for excitement and anger. There was enough to indicate hot blood and unreflecting action. There was immediate provocation. (*People v. Ferraro,* 161 N. Y. 365, 375.) The attack seems to have been the instant effect of impulse. Nor does the fact that the stabbing followed the beginning of the attack by some time affect this conclusion. It was all one transaction under the peculiar facts of this case. If the assault was not deliberated or premeditated then neither was the infliction of the fatal wound.

With due consideration of all the facts presented there is insufficient evidence to justify a conviction of murder in the first degree. Doubtless, on this record the defendant might be convicted of some crime, either murder in the second degree, or if his testimony on the stand is accepted, manslaughter in the first degree. Either verdict might be sustained on the facts. Not the one actually rendered.

The judgment of conviction should be reversed and a new trial ordered.

Cardozo, Ch. J., Pound, Crane, Lehman, Kellogg and O'Brien, JJ., concur.

Judgment reversed, etc.