STATE of Minnesota, Respondent,

v.

Eugene Dennis MOORE, Appellant.

No. C0–90–2137.

Supreme Court of Minnesota.

March 6, 1992.

John M. Stuart, State Public Defender, Steven P. Russett, Asst. State Public Defender, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Paul R. Kempainen, Asst. Atty. Gen., Sara Klise, Law Clerk, St. Paul, and Stephen Rathke, Crow Wing County Atty., Brainerd, for respondent.

OPINION

WAHL, Justice.

Defendant Eugene Dennis Moore appeals his second conviction of first degree premeditated murder,[1] for the shooting death of his wife, Debra Moore. As grounds for appeal, defendant challenges his retrial on charges other than second degree negligent manslaughter; the sufficiency of the evidence with regard to premeditated murder; the reappointment, without his express, on-the-record consent, of the same counsel found to have provided ineffective assistance at his first trial; and the refusal of the trial court to grant a requested change of venue. For the reasons set out below, we affirm the conviction.

Moore was previously tried in 1989 by a Crow Wing County jury in connection with his wife's death and convicted of first degree murder, unintentional second degree murder, and second degree culpable negligence manslaughter. He was sentenced to life imprisonment on the first degree murder conviction. This court reversed the conviction and remanded for a new trial. *State v. Moore,* 458 N.W.2d 90, 98 (Minn. 1990) (*Moore I*).

We held in *Moore I* that the jury returned legally inconsistent verdicts in that first degree murder and second degree manslaughter require mutually exclusive state of mind elements; that defendant was denied effective assistance of counsel entitling him to a new trial when his attorney conceded during closing argument, without defendant's permission, that defendant was guilty of heat-of-passion manslaughter; and that the trial court did not err in admitting evidence based on the blood splatter analysis. *Id.* at 94, 96, 98.

On remand the case was tried before the same judge with the same court-appointed attorney representing the defendant. Defense counsel moved that defendant be retried only for second degree manslaughter pursuant to the decision in *Moore I.* The court denied this motion as well as defen-

dant's motion for a change of venue. Defendant was convicted by jury verdict of first degree murder. This appeal followed.

The evidence at both trials told essentially the same story. Debra Moore was killed by a single blast of a shotgun to her chest at approximately 9:30 p.m. on November 12, 1988. She died from a loss of blood almost instantaneously after being shot. Defendant admitted shooting his wife, but testified that the shooting was accidental. He maintained that the shooting occurred during a struggle when he tried to take the shotgun from his wife who, he said, had picked it up and pointed it at him.

Evidence of the events preceding the shooting was supplied by defendant's statements to police and his trial testimony. Defendant testified that, earlier in the day of the death, he saw some of his relatives driving around the house where he lived with his wife and five of their children in Brainerd. Fearing that the relatives intended to harm him, he took a sawed-off shotgun from its storage place under his bed, loaded it, and placed it on a shelf in the living room. Defendant said he called the Brainerd Police Department at about 4:00 in the afternoon to report that his relatives were circling the house.

Defendant also testified that earlier in the day he had overheard his wife plotting with Richard Engisch, the owner of the house, to kill him.[2] Engisch testified that he did not visit the Moores' house on the day of the killing and denied plotting defendant's death with Debra Moore. Both defendant and his wife had been drinking beer for much of the day. Defendant testified that he had drunk about ten cans of beer. Debra Moore's blood alcohol content was .22% after her death.

According to defendant, after the children were in bed on the night of November 12, his wife began to argue with him. He said he initially tried to ignore her which only made her more angry. Defendant testified that, during the argument, Debra

---

1. Minn.Stat. § 609.185(1).

2. Defendant referred to Engisch as the "caretaker" of the house, but Engisch testified that he owned the property at 1416 Norwood Street where the Moores lived.

took the shotgun from the shelf in the living room, pointed it at him and said she was going to kill him. According to defendant, she had threatened him with the shotgun on two other occasions in the last year. Defendant testified that he jumped up and tried to take the shotgun away from Debra and, in the ensuing struggle, the gun went off, shooting her in the chest. He insisted that Debra was standing upright when she was shot. According to defendant, Debra said she was sorry and walked into the kitchen and back into the living room before collapsing and hitting her head on the dresser.

Defendant drove a screw into the doorframe of the children's bedroom so they could not come out and see their mother's body and the blood which was spattered around the living room. Defendant then tried to clean up the blood and attempted to dispose of the body. He wrapped the body in a plastic bedspread and managed to drag it to the kitchen where police found it when they arrived later that night. Defendant said he considered stealing a car to use to dispose of the body, but could not find one to steal. He then decided to call the police.

Defendant walked to John's Bar in Brainerd at about 11:00 p.m. He ordered a beer and used the change to call police from the public telephone in the rear of the bar. He told the 911 dispatcher that he had just killed his wife and that he wanted the police to come for him. He said he had a .22 caliber handgun with him and that he would "come out shooting" when police arrived and that he would not be taken alive. The dispatcher testified that defendant sounded incoherent and irrational at times and sounded as if he were crying at several points in the conversation. The dispatcher did not remember defendant using the word "accident" to describe his wife's shooting, and the transcript of the conversation does not reveal his characterizing the death as an accident, though there are parts of the transcript that are marked "inaudible." The bar was eventually evacuated. The police rushed the bar and arrested defendant who was unarmed and offered no resistance.

The police took defendant to the Brainerd Police Department and questioned him two times, once immediately after the arrest and again the following afternoon. During the first questioning, Moore's speech rambled and wandered and sounded incoherent and nonsensical at times. He mentioned, among other things, flying "sauce pans," Presidents Bush and Reagan, and the planets Pluto and Uranus as somehow relevant to his conduct. Defendant did not wander during the questioning the next day, however. Though his statements were inconsistent in some details, defendant consistently claimed the shooting was accidental and denied any intent or plan to kill his wife.

The state sought to prove first degree murder by expert testimony and circumstantial evidence. Expert testimony established three facts which tend to prove that the shooting was not accidental. First, Bureau of Criminal Apprehension (B.C.A.) firearm expert Roger Papke analyzed tests conducted with defendant's sawed-off shotgun and concluded that the muzzle of the gun was between two and six feet away from Debra Moore's chest when it was fired, not as close as it presumably would have been in a hand-to-hand struggle over the gun. No gunshot residue was visible on Debra's blouse, also suggesting that the shot was not fired close up. Chemical tests for the presence of residue were not performed, however. Second, the state's expert forensic scientist, Gary Kaldun, testified, on the basis of his analysis and interpretation of blood splatters at the scene, that Debra Moore's chest was about 24 inches above the floor when she was shot and that she could not have been standing upright as defendant testified. Third, the hammer of the shotgun had to be manually cocked and the trigger pulled before it could be fired, which would make an accidental firing unlikely. Furthermore, defendant had two injuries that would be consistent with his holding the gun and firing it in a conventional manner. He had a cut on the web of skin between his thumb and first finger, an injury, according to the state's expert, commonly caused by the gun's recoil. In addition, defendant had a

bruise on his thumb where the gun's hammer would have hit him as it fired.

The state's medical expert also testified that Debra Moore died almost immediately after being shot and could not have walked and talked with defendant before collapsing as he testified she did. In addition, Karen Moore, defendant's daughter, 7 years old at the time of the shooting, testified that she heard her parents arguing after she went to bed and that she heard her father say "Good-bye Debra, I'm going to kill you" before she heard a "big bang." At Moore's first trial, Karen testified her father said, "Debra, that's it, you are dead," before the shot occurred. The jury at the second trial heard the reading of Karen's testimony from the first trial as well as her live testimony.

The court, as agreed to by prosecution and defense, instructed the jury on five charges: first degree premeditated murder; second degree intentional murder; second degree felony (unintentional) murder; first degree ("heat of passion") manslaughter; and second degree (culpable negligence) manslaughter with the specific instruction to return only one verdict. The jury returned a verdict of guilty of first degree murder. This appeal followed.

■ 1. Defendant first contends the trial court erred in allowing defendant to be retried on charges other than second degree culpable negligence manslaughter. He points to the statement in *Moore I* that, had it not been for counsel's unauthorized concession of guilt of first degree manslaughter in the first trial, the court was "inclined" to reduce defendant's conviction to second degree manslaughter pursuant to Minn.Stat. § 611.02. *Moore I,* 458 N.W.2d at 95. Defendant argues that this statement, coupled with the court's expression of concern as to whether counsel's concession of guilt of second degree manslaughter denied defendant a fair trial on that charge and the court's failure to review the sufficiency of the evidence of first degree murder, indicates the intent of the court to limit the new trial to the manslaughter charge alone. Such a reading of *Moore I* is plausible, but incorrect.

■ The general rule is that a remand without instructions does not exonerate the defendant of any of the charges but rather permits retrial on all charges. *State v. Zecher,* 267 Minn. 497, 503, 128 N.W.2d 83, 87 (1964). While the cited language in *Moore I* may be read in isolation to suggest an intent to limit retrial to manslaughter, we did not, by our language, expressly limit retrial to the manslaughter charge alone and analysis of the opinion as a whole makes clear that such was not our intent.

To hold, as we did in *Moore I,* that verdicts are legally inconsistent is not to imply, as defendant seems to argue, that conviction of the lesser offense necessarily implies reasonable doubt about the defendant's guilt of the greater offense. Rather it is to recognize that the underlying factual findings upon which the verdicts were made are invalid. Because no valid verdict was returned, we remanded without limiting instructions. Cases from other jurisdictions support the conclusion in such a case that a new trial on all charges was proper. *See State v. King,* 216 Conn. 585, 594–95, 583 A.2d 896, 901 (1990) (new trial necessary where jury failed to make factual determination as to defendant's mental state); *People v. Gallagher,* 69 N.Y.2d 525, 529–31, 508 N.E.2d 909, 911, 516 N.Y.S.2d 174, 175–76 (1987) (new trial necessary where jury returned inconsistent verdicts and failed to make critical determinations as to mental state); *People v. Hoffer,* 106 Ill.2d 186, 195–96, 88 Ill.Dec. 20, 27–28, 478 N.E.2d 335, 342–43 (where a jury returned legally inconsistent guilty verdicts on both the greater and lesser offenses, a new trial on the greater charge is not barred), *cert. denied,* 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 114 (1985).

Our failure to review the sufficiency of evidence for the first degree murder conviction reflected our intent that the defendant be retried on that charge. Because a new trial was required by counsel's unauthorized concession of guilt in closing argument, it was unnecessary for us to evaluate the sufficiency of evidence because the jury would once again have that opportuni-

ty. In addition, we considered and decided the admissibility of blood splatter evidence because we contemplated that the evidence would be offered in the second trial, as it was in the first, to prove first degree murder.

■ We hold that legally inconsistent guilty verdicts require reversal and, where the remand for a new trial is without express instructions, the defendant may be retried on all charges.

■ 2. Moore next contends that the evidence failed to establish beyond a reasonable doubt that he caused his wife's death intentionally and with premeditation and that the circumstantial evidence was also consistent with an accidental shooting or with "heat of passion" manslaughter. When reviewing the sufficiency of evidence, we view the evidence in the light most favorable to the State and will assume that the jury believed the State's witnesses and disbelieved contrary evidence. *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn.1980). The question on review is whether the facts in the record and the legitimate inferences drawn from them would permit the jury to reasonably conclude that the defendant was guilty beyond a reasonable doubt of the offense of which he was convicted. *State v. Ulvinen*, 313 N.W.2d 425, 428 (Minn.1981). The scope of our review of the evidence is only to determine whether the facts as found by the jury enables the State to meet its burden of proof beyond a reasonable doubt, giving due regard to the presumption of defendant's innocence. *State v. Richardson*, 393 N.W.2d 657, 661 (Minn.1986).

■ Much of the evidence presented by the State in this case, and virtually all of the evidence of premeditation, is circumstantial. Circumstantial evidence in a criminal case is entitled to as much weight as direct evidence. For a jury to convict a defendant on circumstantial evidence alone, however, the circumstances proved must be consistent with the hypothesis that the defendant is guilty and inconsistent with any other rational hypothesis other than guilt. *State v. Bias*, 419 N.W.2d 480, 484 (Minn. 1988). The circumstances must form " 'a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt.' " *Id.* (quoting *State v. Wahlberg*, 296 N.W.2d at 411). Even with this strict standard, the jury is in the best position to weigh the credibility of evidence and thus determines which witnesses to believe and how much weight to give to their testimony. *State v. Daniels*, 361 N.W.2d 819, 826 (Minn.1985).

■ To be guilty of first degree premeditated murder, defendant must have caused the death of Debra Moore with premeditation and with intent to effect her death. Minn.Stat. § 609.185(1). The legislature has defined "premeditation" to mean "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn.Stat. § 609.18. If only intent were proven without premeditation, defendant would be guilty of murder in the second degree. Minn.Stat. § 609.-19(1). This court, and many other courts, have struggled to give effect to the distinction between these two degrees of homicide. That distinction is concerned with the time involved and the defendant's state of mind.[3] Premeditation, by definition, requires some amount of time to pass between formation of the intent and the carrying out of the act. To say, as we said in *State v. Neumann*, 262 N.W.2d 426, 430 (Minn.1978), that premeditation may occur "virtually instantaneously" with the formation of the intent to kill blurs the line between first and second degree murder when it is evident that the legislature in-

---

**3.** Premeditated murder implies a "cool state of blood," *State v. Bowser*, 214 N.C. 249, 253, 199 S.E. 31, 34 (1938), or a "cool mind" that reflects before the act of killing. W. LaFave & A. Scott, *Handbook on Criminal Law* § 73, at 563 (1972). Thus, some courts have held that emotional upset, *People v. Caruso*, 246 N.Y. 437, 445–46,

159 N.E. 390, 392 (1927); intoxication, *Aszman v. State*, 123 Ind. 347, 355–57, 24 N.E. 123, 126 (1890); and feebleness of mind, *People v. Wolff*, 61 Cal.2d 795, 818–23, 394 P.2d 959, 973–77, 40 Cal.Rptr. 271, 285–89 (1964), preclude the mental state necessary for premeditation.

tended the line to be sufficiently distinct to justify punishing persons convicted of the different crimes differently. While we have long recognized that premeditation requires no specific period of time for deliberation,[4] *State v. Gowdy,* 262 Minn. 70, 75, 113 N.W.2d 578, 581 (1961), or extensive planning, *State v. Richardson,* 393 N.W.2d at 664, the state must always prove that, after the defendant formed the intent to kill, some appreciable time passed during which the consideration, planning, preparation or determination required by Minn. Stat. § 609.18 prior to the commission of the act took place.

Direct evidence of premeditation is rare. LaFave has concluded that

existence of the facts of premeditation and deliberation must be determined from the defendant's conduct (so far as we can learn of it, usually from circumstantial evidence) in the light of the surrounding circumstances. * * *

On the basis of events before and at the time of the killing, the trier of fact will sometimes be entitled to infer that the defendant actually premeditated and deliberated his intentional killing. Three categories of evidence are important for this purpose: (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, *planning activity;* (2) facts about the defendant's prior relationship and conduct with the victim from which *motive* may be inferred; and (3) facts about the *nature of the killing* from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design. Illustrative of the first category are such acts by the defendant as prior possession of the murder weapon, surreptitious approach of the victim, or taking the prospective victim to a place where others are unlikely to intrude. In the second category are prior threats by the defen-

dant to do violence to the victim, plans or desires of the defendant which would be facilitated by the death of the victim, and prior conduct of the victim known to have angered the defendant. As to the third category, the manner of killing, what is required is evidence (usually based upon examination of the victim's body) showing that the wounds were deliberately placed at vital areas of the body.

W. LaFave & A. Scott, *Handbook on Criminal Law* § 73, at 564–65 (1972) (emphasis in original) (citations omitted).

 Furthermore, the evidence as a whole may support a finding of premeditation even if no single piece of evidence standing alone would be sufficient. What is required is that the circumstances lead so directly to a finding of premeditation as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt of premeditated murder. *State v. Wahlberg,* 296 N.W.2d at 411.

 Applying these principles to this case, the jury could reasonably conclude, on the basis of facts proven at trial, that defendant Moore formed an intent to kill an appreciable period of time before he committed the act, during which time he considered, planned, prepared or determined to commit the act. The jury could have rationally concluded that these facts are inconsistent with a hypothesis of second degree intentional murder. First, the fact that defendant removed the shotgun from its normal storage place under the bed, loaded it, and placed it on the shelf in the living room early on the day of the killing supports an inference that defendant planned earlier in the day to use the gun later. If the jury disbelieved defendant's story as to why he took the gun out, as we must assume it did, the placement of the loaded gun in the living room earlier on the day of the shooting implies planning and preparation and is inconsistent with the hypothesis that defendant fired the gun

---

**4.** Such a statement is not inconsistent with the rule that some appreciable time must elapse between the formation of the intent to kill and the act of killing. *See Bullock v. United States,*

122 F.2d 213, 213 n. 3 (D.C.Cir.1941), *cert. denied, Bullock v. Rives,* 317 U.S. 627, 63 S.Ct. 39, 87 L.Ed. 507 (1942).

simultaneously with forming the intent to kill his wife. Second, there was evidence of motive. While proof of a motive is not a necessary element of premeditated murder, presence of a motive strengthens a finding that defendant deliberated over his actions and weakens the argument that the killing was spontaneous. Evidence amply demonstrated that defendant's marriage to Debra was a troubled one and that the couple had a history of discord. Further, defendant testified he believed that his brothers had recently slept with his wife and that he believed his wife was plotting with the owner of their house to kill him. The presence of such motivating factors, when viewed in light of the other evidence, strengthens the inference that defendant carried out the requisite planning and deliberation required by premeditation. Finally, the testimony of defendant's daughter, Karen, that she heard defendant say "Good-bye Debra, I am going to kill you now" before she heard the shot permits an inference that defendant had sufficient time to contemplate his actions before carrying them out. This evidence, in conjunction with the evidence of planning, motive, and the physical evidence of the manner in which the killing was done, is consistent with intentional, premeditated murder and inconsistent with intentional second degree murder.

We find no merit in defendant's argument that the evidence is equally consistent with the hypotheses of accidental killing or "heat of passion" manslaughter. The jury could reasonably have found: Debra Moore was sitting on the floor when shot, not standing upright and struggling with defendant as he claimed; defendant was standing above her with the barrel of the gun more than 24 inches from her chest when it went off; Debra Moore's torso was leaning backwards at such an angle that a shot from the gun above her would enter her chest at a perpendicular angle; and defendant was holding the gun in the conventional manner as if he were going to shoot it. These facts, which are amply supported by expert testimony, are not consistent with the hypothesis of an accidental shooting during a struggle for the gun.

As to "heat of passion" manslaughter, that killing must be done in the heat of passion and the passion must be "provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances." Minn.Stat. § 609.20(1). The jury heard defendant's testimony and could have reasonably disbelieved defendant's version of how the argument started and progressed and whether Debra actually grabbed the gun and pointed it at defendant. The jury also could have found beyond a reasonable doubt that a person of ordinary self-control in defendant's situation would not have responded as defendant did. We hold that the evidence establishes beyond a reasonable doubt that the defendant caused his wife's death with intent and premeditation.

3. We turn next to defendant's contention that reappointment at the second trial of the same lawyer whose representation of defendant in the first trial was deemed ineffective, without inquiry by the trial court and an on-the-record waiver by defendant of his right to conflict-free representation, deprived him of his Sixth Amendment right to counsel and necessitates a new trial.

The question is whether a conflict of interest actually existed under these circumstances which should have triggered an inquiry by the trial court. The Sixth Amendment does not require state courts to initiate inquiries unless " 'the possibility of a conflict' [of interest] becomes apparent." *Douglas v. United States*, 488 A.2d 121, 136 (D.C.App.1985) (quoting *Wood v. Georgia*, 450 U.S. 261, 272, 101 S.Ct. 1097, 1104, 67 L.Ed.2d 220 (1981)). The alleged conflict here, according to defendant, arises from the possibility that defense counsel was so preoccupied with not being labeled ineffective a second time that he bent over backwards to please the defendant and, in doing so, abdicated his professional responsibilities and compromised his judgment. Defendant essentially asks us to adopt a rule that reappointment in circumstances such as these creates a per se conflict of interest. He argues that the high potential for a conflict, coupled with the inherent

difficulty in proving that such a conflict actually exists, requires such a rule.

■ Whatever may be the dictates of good practice, there is no constitutional mandate that we accept defendant's invitation. First of all, the United States Supreme Court has held that even in cases where a lawyer is representing co-defendants, where the potential for divided loyalties is obvious, there is no per se conflict and a failure to inquire does not necessarily require a new trial.[5] *Cuyler v. Sullivan,* 446 U.S. 335, 347–48, 100 S.Ct. 1708, 1717–18, 64 L.Ed.2d 333 (1980). It is unlikely that the more subtle conflict alleged here could require more than is required in a dual representation case. Secondly, a rule of per se conflict would run counter to the presumption that lawyers are "fully conscious of the overarching duty of complete loyalty" to the client. *Burger v. Kemp,* 483 U.S. 776, 784, 107 S.Ct. 3114, 3120, 97 L.Ed.2d 638 (1987). The danger that a lawyer's interest in protecting that lawyer's professional reputation may create a conflict of interest is inherent in all attorney-client relationships. Absent evidence to the contrary, however, we must presume that a lawyer resolves those conflicts in favor of the client.

We are unaware of any cases where courts have found that a lawyer's concern for his or her professional reputation has been deemed in conflict with the client's interest in a zealous defense. Cases cited to us by defendant where courts have found personal conflicts to exist have involved conflicts where the defense lawyer had a present legal or financial interest adverse to the client during the representation on the criminal matter, something that is wholly absent here. *See Smith v. Lockhart,* 923 F.2d 1314 (8th Cir.1991) (defense lawyer is party to lawsuit brought against him by defendant); *Douglas v. United States,* 488 A.2d 121 (D.C.App.1985) (defendant's retained counsel is target of contemporaneous disciplinary investigation initiated by defendant); *United States v. Hurt,* 543 F.2d 162 (D.C.Cir.1976) (defendant's current lawyer is presently in litigation with defendant's previous lawyer over the quality of representation in the first trial). Without proof that counsel actually did breach his duty of loyalty to the client and let his personal desire to avoid being labeled ineffective a second time override his professional judgment, we are unwilling to presume that such a conflict exists.[6]

Defendant has not demonstrated that an actual conflict of interests existed in this case. First, defendant was well represented upon retrial. Counsel made appropriate pretrial motions, including a motion to limit retrial to second degree manslaughter. He vigorously cross-examined prosecution witnesses and made appropriate objections. Second, and more to defendant's point, while counsel consulted extensively with defendant throughout the trial, the record does not show that counsel relinquished control of the case to defendant. Under the facts and circumstances of this case, defendant has not been denied his Sixth Amendment right to counsel.

■ 4. Finally, defendant claims that the trial court's denial of his motion for a change of venue violated defendant's right to a fair trial. Minn.R.Crim.P. 25.02, subd. 3 provides: "A motion for * * * change of venue shall be granted whenever it is determined that the dissemination of potentially prejudicial material creates a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. A showing of actual prejudice shall not be required." A trial court has wide discretion in making this determination and will not be overruled unless a clear abuse of discretion is shown. *State v. Drieman,*

---

5. Federal Rule of Criminal Procedure 44(c), however, requires the court to inform the defendant of the potential for conflict in such cases, and to determine whether defendant wishes to waive his right to his own counsel. This is the same requirement we set out in *State v. Olsen,* 258 N.W.2d 898, 906–07 (Minn.1977) for dual representation cases.

6. We agree that in this situation it is better practice to give the defendant the choice between having a new lawyer reappointed or to continue with the same lawyer after an inquiry by the court and waiver of a new lawyer by the defendant on the record. While the Sixth Amendment does not require such a procedure unless an actual—and not merely potential—conflict exists, its use would be salutary.

457 N.W.2d 703, 708 (Minn.1990). Only pre-trial publicity that is shown to affect the minds of specific jurors involved in the case in a way that is prejudicial to the defendant requires a change of venue. *State v. Fratzke,* 354 N.W.2d 402, 406 (Minn.1984).

Defendant bases his motion for change of venue on five newspaper articles about his case. All but one of the articles was published at the time of his first trial, more than a year before his second trial. The fifth article was published about six weeks prior to the beginning of the second trial and discussed this court's decision in *Moore I.* The article was straightforward, factual in content, neutral in tone, and would not appear to inflame undue prejudice against defendant.

The trial court judge and the prosecution and defense lawyers each questioned the jurors about their exposure to publicity about the case before being seated. Twelve of the fourteen jurors chosen, including alternates, had read one or more of the articles, but only one arguably indicated that she would have any difficulty setting aside what she had learned. The trial court did not abuse its discretion in denying defendant's motion for a change of venue.

We affirm the judgment of conviction of murder in the first degree.

Affirmed.