■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DERRICK REDD, Appellant. [35 NYS3d 402]—

Appeal by the defendant from a judgment of the Supreme Court, Queens County (Lewis, J.), rendered January 4, 2012, convicting him of murder in the second degree, abortion in the second degree, and criminal possession of a weapon in the fourth degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing, of that

branch of the defendant's omnibus motion which was to suppress his statements to law enforcement officials.

Ordered that the judgment is reversed, as a matter of discretion in the interest of justice, and a new trial is ordered.

The evidence presented at the suppression hearing and at trial established that on October 25, 2008, at approximately 7:40 p.m., the police were called to an apartment on Lefferts Boulevard in Queens where they found the body of 25-year-old Niasha Delain. Delain, who was nine months pregnant, had been stabbed to death. Her mother and the defendant, who was the victim's boyfriend, were both at the apartment when the police arrived. The defendant agreed to talk to the police and accompanied them to the precinct station house, where he was placed in an interview room at around 10:00 p.m. Shortly after midnight, the defendant received *Miranda* warnings (*see Miranda v Arizona*, 384 US 436 [1966]). The defendant remained at the station house for approximately 27 hours, after which he was released.

The police searched the victim's apartment, the defendant's two cars, and the residences of the defendant's mother, father, and grandparents, but did not find a weapon or other physical evidence connecting the defendant to the murder. The defendant told the police that he was asleep at his mother's home in Queens, approximately 3½ miles from the victim's apartment, during the early morning hours of October 25, 2008. However, a search of cellphone service records related to the defendant's cellphone indicated that, during that time, several calls placed or received by his cellphone were processed by a cellphone tower located approximately one block from the victim's apartment. An expert testified at trial that cellphones signal to the nearest available cellphone tower and that, in Queens, at the time of the murder, the cellphone towers of the defendant's cellphone service provider were located approximately four to five blocks apart.

Eight days after the murder, Jinette Gerve, a neighbor who resided in the apartment above the victim's apartment, reported to the police that between 5:30 a.m. and 6:00 a.m. on October 25, 2008, she heard a woman in the apartment below hers screaming the defendant's first name, along with the words, "Stop," "No," and "Don't do that." This neighbor testified at trial that she had not come forward earlier due to fear and uncertainty concerning the significance of this information. She admitted that she received assistance from the District Attorney's office with regard to her residence, employment, and immigration status.

The hearing court properly denied suppression of the statements the defendant made at the precinct station house, as those statements either were not made in response to custodial interrogation (*see People v Carvey*, 60 AD3d 781 [2009]), or were made following the administration of *Miranda* warnings and the defendant's knowing and voluntary waiver of his *Miranda* rights (*see People v Sepulveda*, 40 AD3d 1014 [2007]; *People v Rushion*, 26 AD3d 448 [2006]).

Viewing the evidence in the light most favorable to the prosecution, we find that it was legally sufficient to establish the defendant's guilt of the charged crimes beyond a reasonable doubt (*see People v Gorham*, 72 AD3d 1108, 1109 [2010]; *People v Doyle*, 48 AD3d 961 [2008]), and the verdict of guilt was not against the weight of the evidence (*see People v Chelley*, 121 AD3d 1505, 1506 [2014]; *People v Johnson*, 49 AD3d 664 [2008]; *People v Doyle*, 48 AD3d 961 [2008]). The jury was in the best position to resolve all credibility issues (*see People v Doyle*, 48 AD3d 961 [2008]).

However, the judgment of conviction must be reversed and a new trial ordered as a result of pervasive prosecutorial misconduct. During opening statements as well as on summation, the prosecutor repeatedly engaged in improper conduct, including misstating the evidence, vouching for the credibility of witnesses with regard to significant aspects of the People's case, calling for speculation by the jury, seeking to inflame the jury and arouse its sympathy, and improperly denigrating the defense (*see People v Moye*, 12 NY3d 743 [2009]; *People v Spence*, 92 AD3d 905 [2012]; *People v Anderson*, 83 AD3d 854, 856-857 [2011]; *People v Spann*, 82 AD3d 1013 [2011]; *People v Walters*, 251 AD2d 433, 434 [1998]; *People v Gomez*, 156 AD2d 462, 463-464 [1989]). Although objections to some of the remarks below were sustained, we nevertheless include them in order to provide a more complete picture of the pervasiveness of the misconduct at issue on this appeal.

For instance, over defense counsel's objection, the prosecutor brought up, during opening statement, irrevelant and prejudicial evidence that the defendant had dated the victim's aunt from 2000 to 2003, but the relationship "did not end happily," and although the victim's parents had never met the defendant, they certainly knew who he was and "wouldn't be fond to hear that [their daughter] was now involved with [the defendant]." The prosecutor then gratuitously insinuated that the defendant was a person of bad character by stating, "This was a problem. Her family didn't want [the victim] to date him because—I'm not going to get into that."

Still during opening statement, the prosecutor stated that "three little cuts" found on the defendant's right hand occurred during the stabbing, theorizing that "if you're holding a knife . . . and you use it repeatedly to stab somebody, one, that can get slippery a little bit with blood and two, if the point of that knife hits something inside the body like a bone or a baby's head or anything like that, the blade may stop for a moment, but the object in motion, your hand, continues to move unless there is [a] cross guard." Although defense counsel objected to this remark, the trial court did not rule on the objection. The prosecutor then repeated essentially the same statement— again over defense counsel's objection—and the court's only response was to say "[t]his is summation." Significantly, none of the prosecution witnesses later testified that the nature and location of the small cuts on the defendant's hand were consistent with an injury sustained while holding a knife (*cf. People v Silvestre*, 118 AD3d 567, 567 [2014]).

During summation, the prosecutor flatly misstated the medical examiner's testimony regarding the estimated time of death, quoting her as saying "I found nothing in my autopsy that would be inconsistent with the time of death of six A.M." and asking, rhetorically, "Can we get more clear than this ladies and gentlemen?" In fact, the medical examiner's testimony was, "I found nothing in my autopsy that would be consistent with the time of death of six a.m. the previous day." While defense counsel objected to the prosecutor's misstatement, the trial court's only response was to say "[t]hat is the jury's determination."

Echoing the earlier remark from his opening statement, the prosecutor again sought to explain, on summation, the small cuts on the defendant's hands by saying that "during this repeated stabbing, you may get yourself a little cut there a little cut there and a little cut there," particularly "[i]f the blade stabs something hard, like a baby." Not only was the remark needlessly inflammatory, it also improperly cast the prosecutor as an unsworn expert witness in his own case. Defense counsel objected, and the trial court asked the prosecutor not to testify.

Also during summation, the prosecutor improperly vouched for Gerve's credibility, describing her as a "sharp-eared woman," and speculating that her sense of hearing was particularly well developed from "listening to her [asthmatic] son breath[e] from a distance since four months old." Defense counsel objected, but the trial court did not rule on the objection.

The prosecutor was also allowed, during summation, to read stricken hearsay testimony from Gerve about a conversation she reportedly had with a friend about calling Crime Stoppers. Defense counsel, who did not have a transcript of Gerve's testimony during the prosecutor's summation, brought the matter to the trial court's attention at the earliest opportunity the following day, while the jury was still deliberating.

Further, in commenting on the defendant's comportment after the discovery of the victim's body, the prosecutor tried to inflame the jury by characterizing the defendant as "cold-blooded" enough to "have stabbed a woman a[s] many times as he did." In sustaining defense counsel's objection, the trial court warned the prosecutor not to inflame the jury. Undaunted, however, the prosecutor continued, calling the defendant "a very angry person" given the amount of force used, the "tremendous amount of [overkill]." Upon defense counsel's further objection, the court directed the jurors not to speculate. The prosecutor continued, stating that the defendant "didn't trust [the victim] with his heart" so "[h]e stabbed her in hers," and also "in the lungs," and "in the face," and "in the hands," and "in the belly, the nine month pregnant belly" because he "wanted to make sure this baby went because the baby is the whole thing." Defense counsel objected, and the court admonished the prosecutor once again that "[i]f you keep inflaming the jury, you are going to regret it."

Nevertheless, the prosecutor again returned to this theme toward the end of his summation, remarking that "any human being would be surprised. But not the person who did it." Defense counsel objected again, but this time the trial court said only that it was "his comment, his interpretation of the evidence." Soon thereafter, the prosecutor continued his string of inflammatory remarks by stating, "It happens, when you can't get somebody to [get] an abortion . . . you have to take care of them the last day yourself." The prosecutor also noted that if the dead child had been born, "he would be three years old." When defense counsel complained that the prosecutor was inflaming the jury, the court simply asked the prosecutor to "wrap it up."

To the extent that the defendant's challenges to some of the above remarks were not preserved for appellate review, we nevertheless reach them in the exercise of our interest of justice jurisdiction (*see* CPL 470.15 [6]; *People v Rowley*, 127 AD3d 884, 885 [2015]). Although some of the above remarks, considered individually, would not require a reversal, it cannot be said that there is no significant probability that the verdict

in this circumstantial case would have been different absent the cumulative, prejudicial effect of these errors (*see People v Spence*, 92 AD3d 905 [2012]; *People v Spann*, 82 AD3d at 1016).

As a new trial must be ordered, we further note that the trial court erred in permitting the prosecutor to elicit extensive evidence of the victim's personal and family life, including how the victim's parents met in high school, the victim's childhood in South Carolina, her job history and career aspirations, her prior boyfriends before the defendant, and the family's nicknames for her. The victim's father was even allowed to testify,.over objection, that the baby's due date, October 25th, was also his birthday. The above evidence, which was admitted through the testimony of the victim's mother and father, was not probative of any issue to be determined at trial and was prejudicial to the defendant (*see People v Harris*, 98 NY2d 452, 490-491 [2002]; *People v Miller*, 6 NY2d 152, 157 [1959]; *People v Caruso*, 246 NY 437, 444 [1927]; *People v Torres*, 45 AD3d 1054, 1055 [2007]). Dillon, J.P., Leventhal, Chambers and Barros, JJ., concur.